Bernard OLCOTT, Plaintiff–Appellant,

v.

DELAWARE FLOOD COMPANY, a limited partnership under the laws of Oklahoma; Lawton Oil Company, a Kansas corporation; William Douglas Layton, individually and as general partner of Delaware Flood Company, 1976 DH; Delaware Flood Company, 1977, EH; Delaware Flood Company, 1978, FH; Delaware Flood Company, 1979, Ltd., limited partnerships under the laws of Oklahoma; Michael Galesi, Defendants–Appellees.

Bernard OLCOTT, Plaintiff–Appellee,

v.

DELAWARE FLOOD COMPANY, a limited partnership under the laws of Oklahoma; Delaware Flood Company, 1976 DH; Delaware Flood Company, 1977, EH; Delaware Flood Company, 1978, FH; Delaware Flood Company, 1979, Ltd., limited partnerships under the laws of Oklahoma; Michael Galesi, Defendants–Appellants,

and

Layton Oil Company, a Kansas corporation; William Douglas Layton, individually and as General Partner of Delaware Flood Company, 1976, DH, Defendants.

Bernard OLCOTT, Plaintiff,

v.

DELAWARE FLOOD COMPANY, a limited partnership under the laws of Oklahoma; Delaware Flood Company, 1977, EH; Delaware Flood Company, 1978, FH; Delaware Flood Company, 1979, Ltd., limited partnerships under the laws of Oklahoma; Michael Galesi, Defendants,

and

Layton Oil Company, a Kansas corporation; William Douglas Layton, individually and as General Partner of Delaware Flood Company, 1976, DH, Defendants–Appellants.

Bernard OLCOTT, Plaintiff–Appellee,

v.

DELAWARE FLOOD COMPANY, a limited partnership under the laws of Oklahoma; Delaware Flood Company, 1976 DH; Delaware Flood Company, 1977, EH; Delaware Flood Company, 1978, FH; Delaware Flood Company, 1979, Ltd., Michael Galesi, Defendants-Appellants,

and

Layton Oil Company, a Kansas corporation; William Douglas Layton, individually and as General Partner, Defendants.

Nos. 92–5242, 93–5147, 93–5148 and 94–5005.

United States Court of Appeals, Tenth Circuit.

Feb. 26, 1996.

David Feinsilver, Feinsilver & Weiner, Millburn, New Jersey, for Appellant Bernard Olcott.

William C. Kellough (Reuben Davis with him on the briefs), Boone, Smith, Davis, Hurst & Dickman, Tulsa, Oklahoma, for Defendants/Appellees and Cross-Appellants.

Before SEYMOUR, Chief Judge; and PORFILIO and EBEL, Circuit Judges.

JOHN C. PORFILIO, Circuit Judge.

Today, we are called upon to resolve a fourteen year-old federal securities dispute raising choice of law and sanctions issues. Bernard Olcott brought this Rule 10b–5 securities action alleging he was defrauded regarding his 1976–1979 investments in four limited partnerships. After a lengthy pre-

trial and discovery process, the district court concluded the limitations period had run on Mr. Olcott's federal claims and dismissed his action in its entirety, including his pendent state claims. Mr. Olcott appeals these dismissals in No. 92–5242.

During the pretrial process, the district court sanctioned the defendants for their failure to comply with a series of court orders concerning an accounting of the financial affairs of the four limited partnerships. All the defendants challenge the propriety of the district court's sanctions in their cross-appeals.[1] Delaware Flood Company and Michael Galesi appeal the sanctions in No. 93–5147, and Layton Oil Company and William Douglas Layton appeal in No. 93–5148.[2]

Finally, in No. 94–5005, the defendants appeal the district court's disposition of two remaining issues: the court's refusal to release funds held in escrow gained from the sale of some of the limited partnerships' assets; and, the court's retention of the defendant's security bond to guarantee the payment of the court's sanctions order.

Our holdings in this case may be summarized as follows. We conclude the district court properly dismissed Mr. Olcott's federal claims based on his 1976, 1977, and 1978 investments as time barred by the Third Circuit's three-year statute of repose. However, we remand to the district court for a factual finding when Mr. Olcott possessed inquiry notice of the underlying facts relating to his 1979 investment. On remand, the district court must determine if Mr. Olcott brought this claim within the one year statute of limitation. We also remand the district court's dismissal of Mr. Olcott's pendent state claims for it to conduct the appropriate death knell analysis. We affirm the district court's imposition of a sanction of $402,527.98 against the defendants for their violations of

---

1. Throughout this opinion, we refer to all the corporate and individual defendants collectively as "the defendants." When we refer to any of the defendants individually, we do so by name.

2. In their brief, Layton Oil Company and William Douglas Layton adopt the arguments made by Delaware Flood Company and Michael Galesi.

Fed.R.Civ.P. 16(f) and 37(b)(2). We decline to consider the district court's $1.9 million default judgment because the district court did not treat it as a final determination. We remand the issue of whether to release the $213,143 in proceeds from the sale of limited partnership assets from court supervision to the district court for further factual findings. Finally, we reverse the district court and exonerate the defendants' $50,000 bond.

## I.

The interminable saga we have before us began when Mr. Olcott invested a total of $1.9 million in four oil drilling and exploration limited partnerships in 1976, 1977, 1978, and 1979. Not pleased with the results of his investment, Mr. Olcott filed suit, alleging the limited partnerships were operated fraudulently. Mr. Olcott named as defendants all four limited partnerships, Delaware Flood Company 1976 DH, Delaware Flood Company 1977 EH, Delaware Flood Company 1978 FH, and Delaware Flood Company 1979 LTD; and Layton Oil Company, Delaware Flood Company, Michael Galesi and William Douglas Layton. These additional defendants had various relationships with the four limited partnerships and each other. Delaware Flood Company was the general partner of all four limited partnerships. In turn, when Mr. Olcott filed suit, Layton Oil Company and William Douglas Layton were the general partners of Delaware Flood Company which was itself a limited partnership. Layton Oil Company subsequently went out of business in 1983.

Michael Galesi was intertwined with the affairs of the other parties in several ways. He was a promoter of the four limited partnerships and a limited partner in some of them. Mr. Galesi also originally was a limited partner of Delaware Flood Company and currently is its general partner. Finally, Mr. Galesi owns Equinox Oil Company which purchased Layton Oil Company's assets, and succeeded to the general partnership interest the defunct company had in the four limited partnerships.

The procedural history of this case has reached Byzantine proportions. Initially, on July 7, 1982, Mr. Olcott filed suit in federal court in the District of New Jersey. On February 18, 1983, the court granted the defendants' forum non conveniens motion made pursuant to 28 U.S.C. § 1404, transferring the case to the Northern District of Oklahoma. A lengthy, multi-round pretrial dispute over an accounting of the financial affairs of all the players ensued. We describe this accounting imbroglio in detail in conjunction with our substantive discussion of the issue in Part IV.

While this case was pending, the Supreme Court decided *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf*, the Court held an implied Rule 10b–5, 15 U.S.C. § 78j(b), claim must be filed no more than three years after the underlying events and within one year after the fraud is discovered. *Id.* at 364, 111 S.Ct. at 2782. In so holding, the Court borrowed the statute of limitations period for express actions as provided under the 1933 and 1934 Securities Acts. *Id.* at 362, 111 S.Ct. at 2781. The same term the Court announced new rules developed in civil cases must be applied retroactively to all pending similar cases. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion). In response to *Lampf* and *Beam*, the defendants filed a motion to dismiss which the district court granted on September 25, 1991. Mr. Olcott appealed to this court.

■ While Mr. Olcott's appeal was pending, Congress amended the Securities Act to prevent the retroactive application of *Lampf*. The amendment provided the applicable statute of limitations period for pre-*Lampf* Rule 10b–5 implied actions would be that of the jurisdiction where the federal court was located, 15 U.S.C. § 78aa–1, the position explicitly rejected in *Lampf*.[3] Mr. Olcott petitioned this court to reinstate his cause of

action pursuant to section 78aa–1. We granted his motion in an unpublished order of June 5, 1992, and remanded the case to the district court.

On remand, the defendants renewed their motion to dismiss which the district court granted. The court explained its reasoning in two orders dated September 23, 1991, and November 12, 1992. First, the court concluded the law of the transferor court applied. Because the case was originally filed in New Jersey, the court applied Third Circuit law. Second, the district court found the Third Circuit's limitations period required a cause of action to be filed within three years of the underlying events and one year from the time the plaintiff had inquiry notice of the fraud. *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537 (3d Cir.1988) (en banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Third, the district court concluded this rule should be applied retroactively. Fourth, the court held Mr. Olcott's claims based on his 1976, 1977, and 1978 investments were time barred because he brought his lawsuit more than three years after the underlying events. Fifth, the court ruled Mr. Olcott's claim based on his 1979 investment was also time barred because Mr. Olcott filed suit in excess of one year after he had notice of the alleged fraudulent activities.

In addition, at the same time the parties litigated the limitations period issue, an ongoing discovery dispute concerning the defendants' repeated failure to provide a complete accounting of the financial affairs of the interlocking partnerships occurred. Ultimately, the defendants' continued recalcitrance in providing the accounting led the district court to sanction them in the sum of $402,527.98 for Mr. Olcott's attorney's fees and accounting expert expenses, and the fee for the court's expert accountant.

Further, the district court ordered the proceeds from the sale of oil and natural gas assets of the four limited partnerships to be held in escrow pending the conclusion of this litigation. On February 22, 1990, the court approved the sale of limited partnership assets to Delaware Flood Company, the highest bidder in an open, advertised auction, for $237,143. The court denied the defendants' requests to release these funds.

Finally, the district court required the defendants to post two bonds. First, the defendants were required to post a bond for $50,000 after the court's original March 17, 1987 sanctions order. Second, the court required the defendants to post a supersedeas bond in

---

3. The amended statute provides:

**15 U.S.C. § 78aa–1. Special provision relating to statute of limitations on private causes of action**
**(a) Effect on pending causes of action**
 The limitation period for any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.
**(b) Effect on dismissed causes of action**
 Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991—
  (1) which was dismissed as time barred subsequent to June 19, 1991, and
  (2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991,
shall be reinstated on motion by the plaintiff not later than 60 days after Dec. 19, 1991.

During the pendency of this appeal, the Supreme Court declared at least part of this amendment unconstitutional on separation of powers grounds. The Court reasoned the amendment unconstitutionally required the federal courts to reopen final judgments. *Plaut v. Spendthrift Farm, Inc.,* — U.S. —, —, 115 S.Ct. 1447, 1463, 131 L.Ed.2d 328 (1995). After the Court decided *Plaut,* we ordered the parties in this appeal to file supplemental briefs on the applicability of the new decision. We conclude *Plaut* has no applicability here because the instant case was pending within the meaning of section 78aa–1(a). The Court's decision in *Plaut,* and the structural separation of powers concerns which animate it, apply only to subsection (b) of the amendment. In short, we believe nothing in *Plaut* disturbs our prior conclusion subsection (a) is constitutional. *Anixter v. Home–Stake Prod. Co.,* 977 F.2d 1533, 1543–47 (10th Cir.1992) (*Anixter II*), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993). *See also Freeman v. Laventhol & Horwath,* 34 F.3d 333, 342–43 and n. 3 (6th Cir.1994) (noting the distinction between subsections (a) and (b) in holding subsection (a) was constitutional).

the amount of $402,527.98 after the court's final April 30, 1993 sanctions order.[4]

## II.

■ Mr. Olcott argues the district court improperly dismissed his Rule 10b–5 claims on limitations period grounds. We review the district court's decision on jurisdictional questions de novo. *Laguna Gatuna, Inc. v. Browner,* 58 F.3d 564, 565 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996); *FDIC v. Hulsey,* 22 F.3d 1472, 1479 (10th Cir.1994). We also review choice of law determinations de novo. *Rocky Mountain Helicopters, Inc., v. Bell Helicopter Textron, Inc.,* 24 F.3d 125, 128 (10th Cir.1994); *Shearson Lehman Bros., Inc., v. M & L Investments,* 10 F.3d 1510, 1514 (10th Cir.1993). The district court's findings of jurisdictional facts are reviewed for clear error. *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995).

### A.

■ To begin with, we must determine the proper limitations period. Mr. Olcott's lawsuit was reinstated pursuant to 15 U.S.C. § 78aa–1. Because his appeal was pending before this court when the statute was amended, subsection (a) applies.

(a) **Effect on pending causes of action**

The limitations period for any private cause of action implied under section 78j(b) of this title that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

In the ordinary case, the statute calls for applying the law as it existed on June 19, 1991, in the jurisdiction where the dispute was pending. However, cases like this which have been transferred between jurisdictions with different limitations periods present a thorny choice of law problem.

The parties dispute whether to apply the limitations period of the transferor jurisdiction, the Third Circuit, or the transferee jurisdiction, the Tenth Circuit. The defendants argue the Third Circuit rule should apply, while Mr. Olcott urges the adoption of the Tenth Circuit standard instead.[5]

The district court concluded Third Circuit law governed after applying two Supreme Court decisions which held, in diversity cases, the transferor forum law applies after transfers made pursuant to 28 U.S.C. § 1404(a). *Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990); *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). We agree.

In *Van Dusen,* the Court held, "where the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen,* 376 U.S. at 639, 84 S.Ct. at 821. The Court concluded, "[a] change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Id.* In so doing, the Court explicitly left unaddressed the question of whether the identical rule would apply if a plaintiff, rather than a defendant, initiated the transfer. *Id.* at 640, 84 S.Ct. at 821. In *Ferens,* the Court answered this remaining question in the af-

---

4. In their brief, the defendants argue the supersedeas bond was in the amount of $400,913. Our calculation of the amount of the sanction matches the docket sheet's slightly greater figure.

5. The choice of law makes a significant difference to Mr. Olcott. In the Third Circuit, a Rule 10b–5 complaint must be filed within "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537, 1550 (3d Cir.) (en banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). In contrast, in the Tenth Circuit, pre-*Lampf* Rule 10b–5 suits were

"subject to the appropriate limitations statute of the state in which the alleged violation occurred." *Hackbart v. Holmes,* 675 F.2d 1114, 1120 (10th Cir.1982). *See also Anixter v. Home-Stake Prod. Co.,* 939 F.2d 1420, 1441 (10th Cir. 1991) (*Anixter I*), *cert. granted and judgment vacated by Dennler v. Trippet,* 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992). In this case, Oklahoma's two-year statute of limitations which runs from the actual or constructive discovery of the fraud and includes principles of equitable tolling would apply. Okla.Stat. tit. 12, § 95(3) (West 1995); *Anixter II,* 977 F.2d at 1544 n. 3.

firmative, holding "that the transferor law should apply regardless of who makes the § 1404(a) motion." *Ferens,* 494 U.S. at 531, 110 S.Ct. at 1284.

In the instant case, the defendants requested the transfer pursuant to § 1404(a) so the original *Van Dusen* rule seemingly would apply. However, both *Van Dusen* and *Ferens* were diversity cases. Underlying both decisions was the Court's long-standing federalism concern of maintaining the integrity of our dual federal and state systems. *See, e.g., Van Dusen,* 376 U.S. at 638, 84 S.Ct. at 820 ("Applying [*Erie's* ] analysis to § 1404(a), we should ensure that the 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed."); *Ferens,* 494 U.S. at 524, 110 S.Ct. at 1280 ("The policy that § 1404(a) should not deprive parties of state-law advantages, although perhaps discernible in the legislative history, has its real foundation in *Erie....* ").

This action was grounded in Rule 10b–5 making it a federal question, not a diversity case. Therefore the question becomes: should the rule the transferor forum law applies be extended to this federal question case?

While this question represents an issue of first impression for this court, we are not wholly without guidance. The Second and Seventh Circuits have previously entered the thicket with divergent results.[6] In *Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993) (per curiam), the Second Circuit considered whether *Van Dusen* should apply in a Rule 10b–5 case which had been consolidated for pretrial purposes pursuant to 28 U.S.C.

§ 1407(a). The court concluded *Van Dusen* was inapplicable, and the law of the transferee court should apply. The court reasoned, "the choice of a limitations period for a federal cause of action is itself a question of federal law." *Id.* at 41 (quoting *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 159 n. 13, 103 S.Ct. 2281, 2288 n. 13, 76 L.Ed.2d 476 (1983) (citations omitted)). After concluding *Van Dusen* "rests upon *Erie,*" *id.* at 40, the court determined its reach was limited to diversity cases. The court explained:

> Although federal courts sometimes arrive at different constructions of federal law, federal law (unlike state law) is supposed to be unitary. Thus, the rule of *Van Dusen* does not apply by analogy where a case is transferred under § 1407 to a federal court that has a different construction of relevant federal law than the federal court in which the action was filed.... Applying *Van Dusen* by analogy to issues of federal law also runs contrary to the principle that, until the Supreme Court speaks, the federal circuit courts are under duties to arrive at their own determinations of the merits of federal questions presented to them....

*Menowitz,* 991 F.2d at 40.

In contrast, the Seventh Circuit reached the opposite conclusion in *Eckstein v. Balcor Film Investors,* 8 F.3d 1121 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994). There, the court was faced with a case which was originally transferred for pretrial purposes under § 1407(a), but later permanently transferred pursuant to § 1404(a). *Id.* at 1124. The court acknowledged the general rule which concerned the Second Circuit in *Menowitz.*

---

**6.** Of the remaining circuits, only the Eighth Circuit has also touched on this issue by noting the circuit split. *See Kansas Pub. Employees Retirement v. Reimer & Koger Assoc., Inc.,* 61 F.3d 608, 611 n. 4 (8th Cir.1995) ("There is some divergence of authority concerning whether the transferor district's choice of law can ever follow the case if the underlying cause of action arises under federal rather than state law."), *cert. denied,* —— U.S. ——, 116 S.Ct. 915, 133 L.Ed.2d 845 (1995). In addition, several commentators have addressed the issue of whether the *Ferens*

and *Van Dusen* rule should apply to federal question cases. *See generally* Kimberly Jade Norwood, *Double Forum Shopping and the Extension of Ferens to Federal Claims That Borrow State Limitation Periods,* 44 Emory L.J. 501 (1995); Robert A. Ragazzo, *Transfer and Choice of Law: The Appellate Model,* 93 Mich.L.Rev. 703 (1995); Tom M. Fini, *The Scope of the Van Dusen Rule in Federal–Question Transfers,* 1992/1993 Ann.Surv. Am.L. 49; Richard L. Marcus, *Conflicts Among Circuits and Transfers Within the Federal System,* 93 Yale L.J. 677 (1984).

Åre different circuits like different states for the purposes of *Van Dusen* and *Ferens?* Usually not. *In re Korean Air Lines Disaster,* 829 F.2d 1171 (D.C.Cir. 1987) (Ruth B. Ginsburg, J.), affirmed on other grounds under the name *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). A single federal law implies a national interpretation. Although courts of appeals cannot achieve this on their own, the norm is that each court of appeals considers the question independently and reaches its own decision, without regard to the geographic location of the events giving rise to the litigation.

*Eckstein,* 8 F.3d at 1126. However, the court reasoned it must determine the applicability of this general rule against the backdrop of Congress' intent in enacting the statutory amendment in response to *Lampf.* The court continued:

> We agree with *Korean Air Lines* that a transferee court normally should use its own best judgment about the meaning of federal law when evaluating a federal claim, but § 27A instructs us to act differently.[7] Section 27A recognizes that different circuits had taken different approaches to the appropriate statute of limitations in suits under § 10(b), and it codifies this fractured nature of federal law for cases filed before June 20, 1991. Congress requires us to apply federal law as courts understood it at a point in the past rather than to make an independent judgment about what that law actually is.

*Eckstein,* 8 F.3d at 1126. Finally, the *Eckstein* court distinguished the earlier Second Circuit case:

> *Menowitz* held that *Van Dusen* and *Ferens* apply only in diversity cases. We believe that this conclusion disregards both the language of § 27A (whose reference to "the jurisdiction" implies a *non*-uniform federal law) and the holdings of *Van Dusen* and *Ferens,* which construed § 1404(a) rather than any principle of state law. Although both of those cases arose under the

diversity jurisdiction, their references to *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), do not imply a ruling limited to state law. *Erie* is itself part of national law, interpreting the Rules of Decision Act, 28 U.S.C. § 1652. *Van Dusen* and *Ferens* accordingly apply whenever different federal courts properly use different rules.... When the law of the United States is geographically non-uniform, a transferee court should use the rule of the transferor forum in order to implement the central conclusion of *Van Dusen* and *Ferens:* that a transfer under § 1404(a) accomplishes "but a change of courtrooms". *Van Dusen,* 376 U.S. at 639, 84 S.Ct. at 821. Section 27A presents such a situation.

*Id.* at 1127 (parallel citations omitted).

We agree with the Seventh Circuit's holding and analysis in *Eckstein.* We believe the clear import of Congress' enactment of § 78aa–1 was to eliminate the retroactive application of *Lampf.* Congress sought to reinstate the pre-*Lampf* circuit disharmony. In short, unlike the typical situation, Congress specifically intended that "the geographical location of the events giving rise to the litigation," *id.* at 1126, should explicitly be taken into consideration. We also agree with the Seventh Circuit that it therefore makes no sense for the applicable law to change simply as a result of a motion to transfer. Further, the legislative history of § 78aa–1 "certainly does not justify the rather startling conclusion that one might 'get a change of law as a bonus for a change of venue.'" *Van Dusen,* 376 U.S. at 636, 84 S.Ct. at 819 (quoting *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 522, 73 S.Ct. 856, 860, 97 L.Ed. 1211 (1953) (Jackson, J., dissenting)). Accordingly, we hold the law of the Third Circuit, as the transferor forum, supplies the appropriate limitations period in this case. We note however the decision that *Van Dusen* and *Ferens* apply in this case is a narrow one based on the unique language and purpose of 15 U.S.C. § 78aa–1. Nothing in our decision should be read to imply *Van*

---

**7.** Section 27A refers to the Securities Act of 1934 which Congress amended in response to *Lampf.* This section has been codified at 15 U.S.C. § 78aa–1. We refer to this provision by its code section throughout this opinion.

*Dusen* and *Ferens* have any broad applicability to federal question jurisdiction cases generally.

## B.

■ Having decided we are bound to apply Third Circuit law, we must determine our sister circuit's limitations period as of June 19, 1991. The answer to this query lies in *Data Access.* After exhaustively summarizing and analyzing the murky terrain concerning the proper limitations period for Rule 10b-5, the court concluded, "the express limitations sections of the Securities Exchange Act of 1934 provide the preferable source of limitations borrowing here." *Data Access,* 843 F.2d at 1550. The court held:

the proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b-5 is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.

*Id.*

■ Because Mr. Olcott filed his claim in 1982, our next inquiry is whether *Data Access* should apply retroactively. The district court concluded it should, after applying the three-part test from *Chevron Oil Co. v. Huson,* 404 U.S. 97, 105–07, 92 S.Ct. 349, 354–55, 30 L.Ed.2d 296 (1971). We agree with the district court's ultimate conclusion, albeit with a slightly different analysis.

The Supreme Court has modified the appropriate retroactivity analysis since *Chevron* was decided nearly a quarter century ago. In *Beam,* a divided Court concluded selective prospectivity had no place in the civil context. 501 U.S. at 544, 111 S.Ct. at 2448; *id.* at 545–46, 111 S.Ct. at 2448–49 (White, J. concurring in the judgment); *id.* at 547–48, 111 S.Ct. at 2449–50 (Blackmun, J. concurring in the judgment); *id.* at 548–49, 111 S.Ct. at 2450 (Scalia, J. concurring in the

judgment).[8] Subsequently, the Court has stated:

[W]e accordingly adopt a rule that fairly reflects the position of a majority of Justices in *Beam:* When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, ——, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993); *see also Plaut,* —— U.S. at ——, 115 S.Ct. at 1450 ("A new rule of federal law that is applied to the parties in the case announcing the rule must be applied as well to all cases pending on direct review.").[9] Further, in *Beam,* the plurality addressed the continued validity of *Chevron:*

Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case. Once retroactive application is chosen for any assertedly new rule, it is chosen for all others who might seek its prospective application. The applicability of rules of law is not to be switched on and off according to individual hardship; ...

*Beam,* 501 U.S. at 543, 111 S.Ct. at 2447–48. As a result of *Beam,* the analysis of *Chevron* is only relevant, if it maintains any relevance at all, in determining whether a new federal rule should apply retroactively across the board. No longer may *Chevron* be used to make individual retroactivity determinations on a case by case equitable basis.

We believe *Beam* and *Harper* apply to the instant case. Accordingly, if the new federal

---

8. *Beam* spawned two different broad viewpoints on the prospective application of new federal rules. One group of three justices concluded new civil rules should always be applied retroactively (Blackmun, Marshall, and Scalia, JJ.). Another group of three justices concluded selective prospectivity was wrong, but pure prospectivity might be appropriate with some new civil rules (Souter, Stevens, and White, JJ.).

9. The Court's decisions mirror its earlier holding that selective prospectivity would no longer occur in criminal cases. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

rule announced in *Data Access* has previously been applied retroactively, it must also be applied retroactively here.

The Third Circuit first addressed whether its new rule should apply retroactively in *Data Access* itself. The court explicitly declined to address whether the new limitations period should apply retroactively to the *Data Access* plaintiffs. The court relied on the fact "[i]n certifying the questions for our consideration [pursuant to 28 U.S.C. § 1292(b) ], the district court did not request that we address the issue of whether our rulings should have prospective effect only and not apply to the present case." *Data Access*, 843 F.2d at 1550. The court left the resolution of this issue to the district court. *Id.* at 1551. The court's refusal to address the retroactivity issue prompted three members of the court to dissent. The dissent applied *Chevron* and concluded, "the rule announced today [should] not be applied to this case." *Id.* at 1553 (Seitz, J. dissenting).[10] However, four ensuing Third Circuit cases have had no difficulty applying *Data Access* retroactively. *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 354–56 (3d Cir.1993); *McCarter v. Mitcham*, 883 F.2d 196, 201–05 (3d Cir.1989); *Gatto v. Meridian Medical Assoc., Inc.*, 882 F.2d 840, 842–44 (3d Cir. 1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *Hill v. Equitable Trust Co.*, 851 F.2d 691, 695–99 (3d Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). Only one Third Circuit opinion determined, after applying *Chevron*, that *Data Access* should not apply retroactively to that particular plaintiff. *Gruber v. Price Waterhouse*, 911 F.2d 960, 964–69 (3d Cir.1990). Mr. Olcott relies upon *Gruber* and two district court cases which

refused to apply *Data Access* retroactively after applying *Chevron*. *In re National Smelting of New Jersey, Inc. Bondholders' Litig.*, 722 F.Supp. 152 (D.N.J.1989); *Newfield v. Shearson Lehman Bros.*, 699 F.Supp. 1124 (E.D.Pa.1988). These cases decided under *Chevron* are inapposite to our analysis under *Beam*. We believe *Beam* requires the retroactive application of *Data Access* in this case because the Third Circuit has applied its new rule retroactively on four occasions.

### C.

■ We now apply *Data Access'* one-year/ three-year limitations period to the facts of Mr. Olcott's case. Initially, the timeliness of Mr. Olcott's claims is judged against the three-year statute of repose. In *Lampf*, the Supreme Court described this three-year time period as an outside limit and declined to apply equitable tolling principles to extend it. 501 U.S. at 364, 111 S.Ct. at 2782. The Court wrote:

> The 1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3–year limit is a period of repose inconsistent with tolling. One commentator explains: "[T]he inclusion of the three-year period can have no significance in this context other than to impose an outside limit." ... Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.

*Id.* (citations omitted). *See generally United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979) (describing the nature of statutes of limitations and statutes of repose.) [11] Accordingly, Mr.

---

**10.** *But compare Gatto v. Meridian Medical Assoc., Inc.*, 882 F.2d 840, 843 n. 4 (3d Cir.1989) ("Often overlooked is the fact that the majority in *Data Access* in effect applied the result retroactively, which is evident because it was disagreement with that silent portion of the holding which prompted the dissent."), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990) *with Gruber v. Price Waterhouse*, 911 F.2d 960, 964 (3d Cir.1990) ("Because the application of our ruling was not requested in the question certified to us in *Data Access*, we did not decide whether the decision should be applied retroactively. We reserved this determination for the

district court."). It appears a disagreement exists among the judges of the Third Circuit on the proper interpretation of *Data Access* on this issue.

**11.** While we are applying Third Circuit law in addressing this issue, our discussion in *Anixter I* is directly on point. *See Anixter I*, 939 F.2d at 1434–36 (discussing the unavailability of employing equitable tolling principles to extend a statute of repose). *See also Waller v. Pittsburgh Corning Corp.*, 946 F.2d 1514, 1515 n. 1 (10th Cir.1991) ("Statutes of limitation bar a claim after a time period that begins to run when the cause of

Olcott's claims based on his 1976, 1977, and 1978 limited partnership investments are time barred because they were not filed until 1982, more than three years after the underlying events giving rise to the violation occurred. In contrast, Mr. Olcott's claim arising from his 1979 investment was filed within the requisite three years. However, the question remains whether Mr. Olcott brought his Rule 10b–5 cause of action within the one year statute of limitations period.

■ The district court concluded Mr. Olcott had sufficient notice more than one year prior to July 9, 1982, when he filed his securities fraud lawsuit. The district court held, "evidence of Plaintiff's suspicions about the 1979 investment within the one-year limitation period establish that his claim arising out of that investment is barred by the one-year rule." Unfortunately, the district court failed to offer any specific facts to support this conclusion. Therefore, we have no basis to evaluate the court's holding and must remand for the court to explain its factual determination. At this point, the factual record is insufficiently developed for us to determine when the statute of limitations began to run in this case.

■ On remand, the district court must determine when Mr. Olcott had notice of the underlying "facts constituting the violation." *Lampf,* 501 U.S. at 364, 111 S.Ct. at 2782; *Data Access,* 843 F.2d at 1550. Inquiry notice of the underlying facts giving rise to a potential Rule 10b–5 cause of action is sufficient. *Gruber,* 911 F.2d at 969. The statute of limitations period accrued when Mr. Olcott knew or should have known of the Rule 10b–5 violation. *Id.* at 962. *See also In re Phar-Mor, Inc., Sec. Litig.,* 900 F.Supp. 777, 780–81 (W.D.Pa.1994); *ITG, Inc. v. Price Waterhouse,* 697 F.Supp. 867, 870–71 (E.D.Pa. 1988).[12] We remind the district court the determination of when Mr. Olcott had notice of the underlying events requires an evidentiary finding. As a result, resolving the no-

tice issue in the procedural context of a motion to dismiss is wrong. We believe it would be more appropriate to make the necessary determination on summary judgment, or, if a genuine issue of material fact remains in dispute, after an evidentiary hearing.

In summary, we hold Mr. Olcott's claims based on his 1976, 1977, and 1978 investments are time barred because he failed to file within the applicable three-year statute of repose. However, we remand to the district court to determine exactly when Mr. Olcott possessed inquiry notice of the underlying events giving rise to his claim relating to his 1979 investment. Such a factual finding on remand is a necessary prerequisite for determining whether Mr. Olcott's remaining claim is time barred by the one-year statute of limitations.

### III.

Next, Mr. Olcott argues the district court erred in dismissing his pendent state law claims after having dismissed his federal claims. The district court dismissed the pendent claims after reasoning: "The Court finds that because complete diversity of citizenship does not exist as to the state pendent claims, these claims must also be dismissed." We agree with Mr. Olcott the court improvidently dismissed these claims at this stage of the litigation.

■ As an initial matter, we are confronted with another difficult choice of law issue. We must determine whether Third Circuit or Tenth Circuit law provides the appropriate standard for reviewing the district court's dismissal of Mr. Olcott's pendent claims. We believe Third Circuit law applies for the reasons discussed in Part IIA above. However, in this context, the choice of law question has only academic rather than transactional significance because both circuits employ the same test.

---

action accrues. Statutes of repose, on the other hand, bar a claim after a period that is triggered by an arbitrary event unrelated to the accrual of the cause of action.").

**12.** Other circuits, including this one, have also adopted inquiry notice as the appropriate standard for triggering when the one-year statute of

limitations period begins to accrue. *See, e.g., Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 609–10 (7th Cir.1995); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 700–01 (2d Cir.1994); *Anixter v. Home–Stake Prod. Co.,* 947 F.2d 897, 898–99 (10th Cir.1991).

We review the district court's dismissal of the pendent state claims for an abuse of discretion. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *Cooley v. Pennsylvania Housing Fin. Agency*, 830 F.2d 469, 476 (3d Cir.1987). A district court has discretion whether to exercise supplemental jurisdiction over state law claims once the federal question has been dismissed. 28 U.S.C. § 1367(c). "In making its determination, the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'" *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1284 (3d Cir.1993) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). In addition, the court should consider the particular circumstances of the case including the nature and extent of the pretrial proceedings. *Id.* at 1284–85 and n. 13.[13] This multifactorial analysis has been called death knell analysis. *Cooley*, 830 F.2d at 475.

Our remand of Mr. Olcott's 1979 claim for further factual findings reestablishes federal question jurisdiction. Therefore, depending on the resolution of the notice issue, a jurisdictional basis may ultimately exist to support supplemental jurisdiction over Mr. Olcott's state claims. However, even if on remand Mr. Olcott's Rule 10b–5 claim is ultimately dismissed in its entirety, the district court erred in the manner in which it dismissed Mr. Olcott's pendent state claims. The court abused its discretion by failing to conduct the appropriate death knell analysis to determine if it should retain jurisdiction over the pendent state claims despite having previously dismissed the federal cause of action.

Finally, we offer the district court some additional guidance for its task on remand. On several occasions, the Third Circuit has affirmed a district court's decision to retain supplemental jurisdiction over pendent state claims after having dismissed the federal

cause of action. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 737–38 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474, 480 (3d Cir.1979). We believe these precedents should lead the district court to carefully examine the nature of the pretrial activities which occurred in this case. In particular, the fairness to Mr. Olcott in dismissing his pendent state claims depends in large measure on whether any opportunity remains for him to bring them in New Jersey state court at this late date. The district court should determine how much of the lengthy delay in this litigation is attributable to changes in the applicable law, and how much is due to the defendants' recalcitrance in failing to submit the complete accounting. If the majority of the delay is attributable to the defendants' sanctionable conduct the equities may favor Mr. Olcott, allowing him to proceed with his state claims in federal court.

## IV.

In addition, both parties appeal the district court's sanctions order. The defendants challenge the district court's jurisdiction to impose a sanction of $402,527.98 after having dismissed Mr. Olcott's lawsuit. The defendants also argue the district court abused its discretion in sanctioning them. Mr. Galesi specifically asserts the district court abused its discretion because "the findings leading to the [sanctions] order are totally unsupported by the evidence." In turn, Mr. Olcott requests we exercise our inherent authority to reduce the district court's $1.9 million default judgment order to a binding judgment against the defendants.

## A.

This seven-year accounting dispute began on March 18, 1986, when, as part of a stipulated pretrial scheduling order, the defendants agreed to:

furnish plaintiff with a full, complete, meaningful, and formal accounting of all of

---

13. As noted above, we have adopted an identical rule. *See Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995); *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990).

the financial affairs of [the four limited partnerships], setting forth all items of contribution, income, and expense as well as the disposition of all assets and monies, for each of the four limited partnerships, including a full and complete accounting for all monies paid by each of the partnerships under the turnkey drilling contracts. . . .

An interim status report on the accounting was due within ninety days, and the accounting itself was due in six months. The defendants missed both deadlines. When the accounting was ultimately filed on January 13, 1987, Mr. Olcott challenged its sufficiency. The court's appointed expert accountant, Mr. Charles H. Ostrander, CPA, found the accounting inadequate. After an evidentiary hearing, the district court concluded in a March 17, 1987 order the accounting failed to comply with the stipulation and ordered the defendants to file a supplemental accounting. Because of the deficiencies, the court ordered the defendants to "pay all costs and fees incurred by the Plaintiff from December 19, 1986 regarding the accounting issues until all accounting issues are resolved."

On May 12, 1987, the defendants filed their first supplemental accounting. Mr. Olcott again objected, and the court's expert agreed the accounting remained insufficient. After another hearing, the district court found the supplemental accounting deficient. In an October 14, 1987 order, the court addressed the issue of sanctions against the defendants. Initially, the court found there was not "sufficient evidence of bad faith on the part of the Defendants to justify the imposition of default judgment," at this time. However, the court reiterated its sanctions order. The court ordered the defendants to pay Mr. Olcott's attorney's fees and expert expenses related to litigating the sufficiency of the accounting pursuant to Fed.R.Civ.P. 16 and 37(b). The court warned the individual defendants they would be subject to "the full panoply of sanctions for noncompliance" with the court's accounting orders. Finally, the court rejected Mr. Olcott's request to impose sanctions pursuant to Fed.R.Civ.P. 11 or 28 U.S.C. § 1927 against the defendants' counsel.

After two extensions, on April 15, 1988, the defendants filed their second supplemental accounting. Again, Mr. Olcott contested its sufficiency. The court's expert again found the accounting wanting. After a third hearing, in a February 8, 1990 order, the court found under the totality of the circumstances the defendants noncompliance with its accounting orders was willful. The court based this factual finding on the testimony of two of Mr. Galesi's former counsels whose firm withdrew after Mr. Galesi failed to comply with the accounting orders. Counsel testified Mr. Galesi, "had told him that he would never render an accounting to the Plaintiffs." After making these findings of fact, the court concluded the defendants' noncompliance constituted a bad faith refusal to comply with the court's accounting orders as a matter of law. As a result, the court determined a default judgment was the appropriate sanction for the defendants' continued abuse of the legal process. The court concluded:

Plaintiff is entitled to a judgment against the Defendants, jointly and severally, for his investment of $1.9 million dollars less any portion of those funds which Defendants can establish were utilized for legitimate purposes under the terms and provisions of the Limited Partnership Agreements. There will be a trial at which the burden will be upon the Defendants to establish to the satisfaction of the fact finder that any portion of Plaintiff's contribution was utilized for legitimate purposes under the terms of the agreements among the parties.

Following this order, the issue remained dormant during the litigation of the limitations period question. The court revisited the sanctions issue in an April 30, 1993 order, concluding it possessed the jurisdiction to impose sanctions against the defendants despite having dismissed Mr. Olcott's lawsuit. The court reasoned:

In the case at bar, this Court relied upon the authority conferred by Rules 16 and 37, Fed.R.Civ.P. in its October 14th order. Is the order in the nature of a sanction or of civil contempt? A review of the Order in light of the record reveals that it is both: it sought both to sanction the past behav-

ior of the Defendants in impeding the judicial process and to impel them to mend their ways in the future.... [T]he sanction order was precipitated by a pattern of recalcitrance by Defendants, which the Court attempted to punish *and* forestall. A fair reading of the October 14th Order compels the conclusion that the Order was a hybrid of civil contempt and of sanctions....

On this record, it seems beyond peradventure that the October 14th Order was, in part, analogous to a Rule 11 sanction for frustrating and impeding the judicial process. And this Court specifically so finds. The Court, therefore, concludes that, in spite of the fact that the Order had a civil contempt component, it was nonetheless an authorized exercise of its powers pursuant to *Willy*. The Order is, thus, enforceable.

The court earlier had referred the amount of the attorney's fees and accounting expenses to a magistrate for a report and recommendation. The magistrate issued two reports on the amount of the sanction which totalled $388,252.98. The court adopted the magistrate's recommendation. In addition, the court required the defendants to pay the $14,275 fee of the court's expert accountant for a total award of $402,527.98. In its final sanctions order the court neglected to mention the $1.9 million default judgment against the defendants.

### B.

■ In their cross-appeal, the defendants contest the district court's jurisdictional basis for levying the sanction. The district court imposed its sanction pursuant to Fed. R.Civ.P. 16(f) and 37(b). The court reasoned while its sanctions order was a hybrid of a civil contempt citation and Fed.R.Civ.P. 11, its predominate purpose was punitive in response to the defendants' continued recalcitrance in failing to submit a complete and meaningful accounting. The court concluded its order was most analogous to a Rule 11 sanction and was therefore enforceable. We agree.

■ As the district court recognized, the Supreme Court has distinguished between civil contempt and Rule 11 sanctions. Broadly speaking, in the absence of subject-matter jurisdiction, Rule 11 sanctions are enforceable while a civil contempt citation is not. *Compare Willy v. Coastal Corp.*, 503 U.S. 131, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992) *with United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988). The parties offer opposing characterizations of the district court's sanction in an effort to analogize them to either *Willy* or *Catholic Conference*. We examine these Supreme Court precedents and the nature and purpose of the sanction to determine which analogy represents the better fit.

In *Catholic Conference*, the Court examined the parameters of enforcing civil contempt citations. The underlying dispute concerned Abortion Rights Mobilization's (ARM) lawsuit seeking to revoke the tax exempt status of the Catholic Church of the United States based on the Church's alleged improper political participation on the abortion issue. *Catholic Conference*, 487 U.S. at 74–75, 108 S.Ct. at 2269–70. During the course of the litigation, ARM served subpoenas *duces tecum* against two non-parties, the United States Catholic Conference and the National Conference of Catholic Bishops, in an effort to discover documentation supporting its claims. The two organizations refused to comply with the subpoenas, and the district court held them in civil contempt. *Id.* The Court held the contempt citation was unenforceable, reasoning:

a nonparty witness can challenge the court's lack of subject-matter jurisdiction in defense of a civil contempt citation, notwithstanding the absence of a final judgment in the underlying action. Federal Rule of Civil Procedure 45 grants a district court the power to issue subpoenas as to witnesses and documents, but the subpoena power of a court cannot be more extensive than its jurisdiction. It follows that if a district court does not have subject-matter jurisdiction over the underlying action, and the process was not issued in aid of determining that jurisdiction, then the process is void and an order of civil contempt based on refusal to honor it must be reversed.

*Id.* at 76, 108 S.Ct. at 2270. As a result, the Court concluded the district court's civil contempt citation was not enforceable against the Conferences unless the court "had subject-matter jurisdiction in the underlying action." *Id.* at 80, 108 S.Ct. at 2272. The Court remanded the case for this determination to be made. *Id.* If no subject-matter jurisdiction ultimately existed, "then the subpoenas *duces tecum* are void, and the civil contempt citation must be reversed 'in its entirety.'" *Id.* at 80, 108 S.Ct. at 2272–73 (quoting *United States v. United Mine Workers of Am.,* 330 U.S. 258, 295, 67 S.Ct. 677, 697, 91 L.Ed. 884 (1947)).

■ In contrast, in *Willy,* the Court concluded Rule 11 sanctions could be enforced despite a lack of subject-matter jurisdiction. Originally, Mr. Willy sued Coastal Corporation in Texas state court for claims arising from the termination of his employment. *Willy,* 503 U.S. at 132–34, 112 S.Ct. at 1078. Coastal Corporation removed the case to federal court claiming federal question jurisdiction. Over Mr. Willy's objection, the district court concluded it possessed subject-matter jurisdiction. Subsequently, the district court dismissed the case for failing to state a claim, and also imposed Rule 11 sanctions against Mr. Willy and his attorney. On appeal, the Fifth Circuit concluded the district court lacked subject-matter jurisdiction, but upheld the Rule 11 sanctions. *Id.* The Court upheld the Rule 11 sanctions, explaining:

> A final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it. But such a determination does not automatically wipe out all proceedings had in the district court at a time when the district court operated under the misapprehension that it had jurisdiction.

*Id.* at 137, 112 S.Ct. at 1080. Among the collateral issues a federal court may consider after an action is no longer pending is a Rule 11 sanction. *Id.* A court may do so because the "imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction

would be appropriate." *Id.* (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 396, 110 S.Ct. 2447, 2456, 110 L.Ed.2d 359 (1990)).

Importantly for our present purposes, the Court in *Willy* distinguished its earlier decision in *Catholic Conference.* The Court criticized Mr. Willy's reliance on *Catholic Conference* "as establishing the proposition that a sanction must fall if imposed when jurisdiction is in fact absent." *Willy,* 503 U.S. at 138, 112 S.Ct. at 1081. In response, the Court stated:

> *Catholic Conference* does not stand for such a broad assertion. A civil contempt order has much different purposes than a Rule 11 sanction. Civil contempt is designed to force the contemnor to comply with an order of the court; Rule 11 is designed to punish a party who has already violated the court's rules. Given that civil contempt is designed to coerce compliance with the court's decree, it is logical that the order itself should fall with a showing that the court was without authority to enter the decree.
>
> The interest in having rules of procedure obeyed, by contrast, does not disappear upon a subsequent determination that the court was without subject-matter jurisdiction.... [T]here is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules in the interim, and to allow the courts to impose Rule 11 sanctions in the event of their failure to do so.

*Id.* (citations and footnotes omitted).

We conclude the district court's sanction imposed pursuant to Rule 16(f) and 37(b) is sufficiently analogous to Rule 11 sanctions to be enforced despite a lack of subject-matter jurisdiction. The analogy to *Willy* simply provides a better fit than *Catholic Conference.* The predominant purpose of the two rules invoked by the district court is to punish litigants and attorneys for their noncompliance with pretrial and discovery orders. An analysis of the text of the two rules and case law interpreting them clarify this intent.

First, the texts and plain meaning of Rule 16(f) and Rule 37(b) complement Rule 11.[14] The three rules share a common purpose, which they seek to achieve by employing substantially similar operative language. For example, all three rules use the term sanctions. While sanctions has become a generic legal term, the Federal Rules maintain a clear distinction between sanctions and civil contempt. Various rules use the two terms for different purposes. *Compare* Rule 11, Rule 16(f), Rule 26(g)(3), Rule 37(a)(4) and Rule 37(b)(2) (sanctions) *with* Rule 4.1(b), Rule 37(b)(2)(D), Rule 45(e), and Rule 56(g) (contempt). These differences indicate the drafters of the Federal Rules knew and appreciated the distinction between sanctions and civil contempt. The rules do not use the two terms of art interchangeably. Further, all three rules provide the court the discretionary option of awarding reasonable attorney's fees and costs resulting from the rule violation. The district court's discretion allows it to depart from the traditional rule of each party paying its own litigation costs, expenses and attorney's fees. *See generally* Fed.R.Civ.P. 54(d); *Alyeska Pipeline Serv. Co., v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Aguinaga v. United Food & Commercial Workers Int'l Union,* 993 F.2d 1480 (10th Cir.1993). This departure from the American Rule demonstrates the punitive nature of the sanctions of the three rules.

**14.** To facilitate our analysis, we have set forth the texts of the three rules in the margin. First, Rule 16(f) provides:

**Fed.R.Civ.P. 16(f) Sanctions.** If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust. Second, Rule 37(b)(2) provides:

**Fed.R.Civ.P. 37(b)(2) Sanctions by Court in Which Action is Pending.** If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(E) Where a party has failed to comply with an order under Rule 35(a) requiring that party to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this subdivision, unless the party failing to comply shows that that party is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Finally, Rule 11(c)(2) provides:

**Fed.R.Civ.P. 11(c)(2) Nature of Sanction; Limitations.** A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

Finally, the three rules grant district courts substantial discretion to craft their orders to serve the interests of justice. Both Rule 16(f) and Rule 37(b)(2) require the court to keep considerations of justice in mind when imposing sanctions for rule violations. The two rules provide a list of potential options for the court's consideration, including costs and fee shifting, but ultimately leave it to the court's discretion to "make such orders ... as are just." *See, e.g., Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707, 102 S.Ct. 2099, 2107, 72 L.Ed.2d 492 (1982) ("Rule 37(b)(2) contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery.") Similarly, Rule 11(c) includes justice as a consideration by requiring courts to impose an "appropriate sanction." And Rule 11(c)(2) adds the additional related consideration of deterring similar sanctionable conduct in the future. These textual similarities among Rule 16(f), Rule 37(b) and Rule 11 help establish their similar design and purpose. All three rules were designed to enforce compliance with the applicable procedural rules at different stages of federal court litigation. *See, e.g., Jones v. Thompson,* 996 F.2d 261, 264 (10th Cir.1993) (describing how the Federal Rules and the court's inherent powers provide "ample tools to deal with a recalcitrant litigant," at the different stages of litigation).

Case law interpreting both Rule 16(f) and Rule 37(b) provides additional support for our conclusion the rules serve a predominantly punitive purpose. The Supreme Court has declared:

> Both parties and counsel may be held personally liable for expenses, "including attorney's fees," caused by the failure to comply with discovery orders. Rule 37 sanctions must be applied diligently both "to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might by tempted to such conduct in the absence of such a deterrent."

*Roadway Express, Inc. v. Piper,* 447 U.S. 752, 763–64, 100 S.Ct. 2455, 2462–63, 65 L.Ed.2d 488 (1980) (footnote omitted) (quoting *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam)). We have also noted the punitive nature of Rule 37(b)(2) sanctions. *State of Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1375 (10th Cir.), *cert. denied,* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978). *See generally* Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* §§ 2282–84. Similarly, while the Court has not addressed the issue, we have previously recognized the punitive purpose of Rule 16(f). In *Matter of Sanction of Baker,* 744 F.2d 1438 (10th Cir.1984) (en banc), *cert. denied,* 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985), we offered the following description:

> While on the whole Rule 16 is concerned with the mechanics of pretrial scheduling and planning, its spirit, intent and purpose is clearly designed to be broadly remedial, allowing courts to actively manage the preparation of cases for trial.... [T]here can be no doubt that subsection (f), added as part of the 1983 amendments to Rule 16, indicates the intent to give courts very broad discretion to use sanctions where necessary to insure not only that lawyers and parties refrain from contumacious behavior, already punishable under the various other rules and statutes, but that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial.

*Id.* at 1440. Further, the *Baker* court identified the two complementary purposes of the rule. "The primary purpose of sanctions in this context is to insure reasonable management requirements for case preparation. The secondary purpose is to compensate opposing parties for inconvenience and expense incurred because of any noncompliance with the reasonable management orders of the court." *Id.* at 1441; *G.J.B. & Assoc., Inc. v. Singleton,* 913 F.2d 824, 831 (10th Cir.1990). *See generally* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1531. In *Baker,* the court recognized sanctions imposed pursuant to Rule 16(f) were, at least in

part, designed to punish noncompliance with pretrial orders.

■ In addition, the defendants challenge the applicability of both Rule 16(f) and Rule 37(b) to the accounting order at issue here. First, they contend Rule 16(f) is inapplicable because the accounting order reached the merits of Mr. Olcott's case and was not concerned with "the mechanics of pretrial conferences and scheduling." *Baker,* 744 F.2d at 1441. Second, the defendants argue Rule 37(b) is also inapposite because "no federal discovery rule even approaches the scope or depth of the District Court's accounting orders here." Again, we disagree.

We believe the district court's reliance on both Rule 16(f) and Rule 37(b) was logical and appropriate under the circumstances. Originally, the defendants consented to provide Mr. Olcott with the accounting. The parties' agreement was memorialized in the district court's Supplementary Scheduling Order of March 18, 1986. Presumably, one rationale for including the accounting agreement as part of a pretrial scheduling order was the specific deadlines for filing both the interim status report and the accounting itself. Under the terms of the agreement, the district court was responsible for enforcing compliance. We disagree with the defendants that the accounting was made part of the pretrial order merely "for convenience only." Instead, we believe the district court properly included the accounting in its pretrial order "to insure early judicial intervention in the process of trial preparation and proper conduct of that entire process." *Id.* The court's inclusion of the accounting in the pretrial order allowed it to enforce the procedural deadlines agreed to by the parties.[15] The fact the accounting became central to the parties' pretrial disputes vindicates the district court's decision.

The district court's reason for attempting to enforce the defendants' obligation to provide the accounting through Rule 37(b)(2) is even clearer. Mr. Olcott sought an agreement about the accounting for the purpose of discovery. The central question posed by

Mr. Olcott's Rule 10b–5 lawsuit was what happened to the money he invested. His allegation of fraud centered on the defendants' alleged improper allocation of this money either to activities ultra vires to the limited partnership agreements or the defendants' improper commingling of partnership assets. Thus, an accounting was necessary for Mr. Olcott to prove fraud. Further, the record indicates Mr. Olcott unsuccessfully attempted to employ more traditional discovery options. He turned to an accounting after it became increasingly clear depositions, interrogatories, document requests, and requests for admissions would not provide the necessary answers. Under these circumstances, we agree with the district court the accounting was a discovery device making enforcement pursuant to Rule 37(b)(2) appropriate.

We believe the combination of Rule 16(f) and Rule 37(b) supports the district court's imposition of the sanction against the defendants. We reach this conclusion in part based on the broad principles of the Federal Rules and the purpose of the sanction. Recently, in a different context, we noted, "we see no principled distinction between sanctions imposed for discovery violations and sanctions imposed for noncompliance with other orders." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir.1994). We find no such distinction among Rule 16(f), Rule 37(b)(2), and Rule 11 here either. We believe the focus in this case should be on the defendants' lengthy noncompliance with the district court's orders. The seven-year accounting dispute expended far more judicial resources than should have been necessary. Mr. Olcott and the district court were forced to litigate the sufficiency of the accounting three times. These basic facts of the nature of this dispute should not be lost in a detailed legal analysis of which federal rules of civil procedure is the most appropriate vehicle for the district court's sanctions order. In this context, we find it appropriate to recall the point made by Chief Judge Murrah writing for this court almost thirty years ago. "The administration of the rules lies necessarily

---

**15.** As we make clear below, the district court was also able to enforce the substance of the

parties' agreement through Rule 37(b)(2).

within the province of the trial court with power to fashion such orders as may be deemed proper to vouchsafe full discovery for the just, speedy and inexpensive determination of the lawsuit." *Robison v. Transamerica Ins. Co.*, 368 F.2d 37, 39 (10th Cir. 1966).

Accordingly, we hold the district court had jurisdiction under *Willy*, based on the punitive nature of Rule 16(f) and Rule 37(b)(2), to enforce the sanction of $402,527.98 against the defendants.

### C.

Further, the defendants argue the district court abused its discretion by imposing a sanction against them for their failure to comply with the court's accounting orders. They assert their failure to submit a complete accounting "was unintentional and not worthy of sanction." Individually, Mr. Galesi maintains "the record here is absolutely devoid of credible evidence supporting findings that [he] willfully failed or refused to comply with the District Court's accounting orders."

■ We review the district court's sanctions order for an abuse of discretion. The identical standard of review applies for sanctions imposed pursuant to Rule 16(f) or Rule 37(b)(2). *Comcoa, Inc. v. NEC Telephones, Inc.*, 931 F.2d 655, 666 (10th Cir.1991); *Mobley*, 40 F.3d at 340. We accept the district court's factual findings underpinning its sanctions order unless clearly erroneous. *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir.1992); *Turnbull v. Wilcken*, 893 F.2d 256, 258 (10th Cir.1990) (per curiam).

■ In reviewing the district court's sanction, we examine the totality of the circumstances involved in the case. *Comcoa*, 931 F.2d at 666. Sanctions under Rule 16(f) and Rule 37(b)(2) must be in the interests of justice and proportional to the specific violation of the rules. In discussing sanctions imposed pursuant to both rules, we have previously noted:

> The award of fees and expenses for noncompliance with the rules is discretionary, and the amount and impact of a monetary sanction should depend on the seriousness of the violation and where the fault lies, i.e.

with counsel or client. However, in the absence of a finding of bad faith, there must be a sufficient nexus between noncompliance with the rules and the amount of fees and expenses awarded as a sanction.

*Turnbull*, 893 F.2d at 259 (citations omitted). More recently, in analyzing a Rule 37(b)(2) sanction we cautioned, "[t]he district court's discretion to choose a sanction is limited in that the chosen sanction must be both 'just' and 'related to the particular 'claim' which was at issue in the order to provide discovery.'" *Ehrenhaus*, 965 F.2d at 920–21 (quoting *Insurance Corp. of Ireland*, 456 U.S. at 707, 102 S.Ct. at 2107)).

■ The district court imposed a sanction against the defendants because their failure to submit a complete, meaningful accounting directly resulted in significant costs to the court and Mr. Olcott. The three evidentiary hearings required Mr. Olcott to pay his lawyers and hire expert accountants to evaluate the sufficiency of the defendants' accounting. Additionally, the court's expert was required to assess the accounting on each of the three occasions. The court imposed a sanction of $402,527.98 which equaled the total of Mr. Olcott's expenditures and the court's expert's fee.

Our review of the record convinces us that the court's sanction was both generally appropriate and proportionate to the defendants' abuse of the legal process. The court expressly limited its sanction to those expenses and attorney's fees directly attributable to the defendants' sanctionable conduct. But for the defendants' actions, the funds to pay these costs would have been allocated differently. Here, we are not confronted with the situation where a court awarded the entire litigation costs of the adverse party as a sanction. *Turnbull*, 893 F.2d at 259. Instead, the sanction was specifically targeted to the litigation costs and fees associated with the defendants' failure to submit the accounting.

■ Both the defendants as a group, and Mr. Galesi individually, attack the district court's factual findings their failure to submit a sufficient accounting was willful and taken

in bad faith. We give substantial deference to the district court's factual findings generally. However, "[w]here as here, a factual determination rests upon the credibility of a witness, Rule 52(a) demands even greater deference to the findings of the trial judge." *Robinson v. Audi Aktiengesellschaft,* 56 F.3d 1259, 1268 (10th Cir.1995) (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied,* —— U.S. ——, 116 S.Ct. 705, 133 L.Ed.2d 661 (1996).

The district court based its findings on the testimony of two of the defendants' former attorneys. They testified Mr. Galesi originally offered an accounting solely to obtain a continuance and never intended to fully comply with the court's accounting orders. While it is true Mr. Galesi vigorously disputed his prior counsels' testimony both before the district court and on appeal, the district court was certainly entitled to countenance the attorneys' version of the events over Mr. Galesi's. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1492 (10th Cir. 1994) (quoting *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511). *See also Willner v. University of Kansas,* 848 F.2d 1023, 1030–32 (10th Cir.1988) (per curiam), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). Faced with two versions of what happened, the district court was forced to make credibility determinations.

Having observed all the witnesses during the evidentiary hearings the district court rejected Mr. Galesi's position. We will not second-guess this decision on appeal. We believe sufficient evidence exists in the record to support the district court's determination Mr. Galesi and the other defendants acted willfully and in bad faith in failing to fully comply with the court's accounting orders. The district court did not abuse its discretion in imposing a sanction of $402,527.98 against the defendants.

## D.

■ Finally, Mr. Olcott asks us to exercise our inherent authority to reduce the district court's $1.9 million default judgment order to a binding judgment against the defendants. As a threshold matter, we must address our own jurisdiction to review this issue. *City of Chanute, Kansas v. Williams Natural Gas Co.,* 31 F.3d 1041, 1045 n. 8 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995); *United States v. P.H.E., Inc.,* 965 F.2d 848, 850 (10th Cir.1992). Congress has granted the courts of appeals jurisdiction over all final decisions of the district courts. 28 U.S.C. § 1291. "The Supreme Court has described a final decision as generally 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *G.J.B. & Assocs.,* 913 F.2d at 827 (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). There is no question a final decision has been reached on the merits of Mr. Olcott's lawsuit based on the district court's disposition of the defendants' motion to dismiss.

■ Even though we have jurisdiction to review the default judgment, we decline to do so because the district court's order leaves a final determination of the issue unresolved. The district court's failure to make a resolution of the default judgment is easily explained. The default judgment was part of the district court's order of February 8, 1990, which was issued prior to either of the court's dismissals in this case. The purpose of the default judgment was to coerce the defendants into completing the accounting for trial. The default judgment altered the burden of proof at trial so that the defendants would have to establish Mr. Olcott's $1.9 million investment was used properly. At trial, the defendants would be able to establish "the funds were utilized for legitimate purposes under the terms and provisions of the Limited Partnership Agreements." Mr. Olcott would receive whatever money the defendants failed to prove was properly invested. After the court dismissed Mr. Olcott's cause of action, the default judgment became moot because the court's decision abrogated the possibility of a trial. Indeed, the court's final sanction order neglects to mention the default judgment. We find

this omission significant. This omission indicates the district court ultimately intended only to impose the Rule 16(f) and Rule 37(b)(2) sanctions against the defendants. Mr. Olcott may not appeal the district court's decision to abandon the default judgment as a sanction because the court never entered a final order on this topic. We therefore decline to review the merits of this issue.

However, we note the district court may revisit the default judgment issue on remand. If the court ultimately revives Mr. Olcott's cause of action based on his 1979 investment, the court could take the opportunity to revisit the appropriateness of a default judgment at that time.

### V.

■ In addition, the defendants appeal the district court's refusal to release $213,143 in funds held at Western National Bank in Tulsa, Oklahoma. The funds came under court supervision when the four limited partnerships sought court approval to sell some of their oil and natural gas assets. On February 22, 1990, the district court conditionally approved the sale by a brief minute order. The order does not explain its rationale for requiring the funds to be deposited and maintained under court supervision.

On November 6, 1991, the defendants requested the district court release the funds. The court took no action. On February 18, 1993, the defendants renewed their motion. The district court denied the motion in its April 30, 1993 order as follows:

> The Renewed Motion of the Defendants for Post Judgment Relief will be DENIED in its entirety. The motion may be reurged when the parties have complied with the directives and provisions of this Order.

The district court offered no additional explanation of why it retained these funds under court supervision on any subsequent occasion.

The district court's summary disposition of this issue renders it impossible for us to review the propriety of its decision. The court has never offered any reason on the record which we have been able to discover for refusing to release these funds from its control. We can speculate the rationale for requiring these limited partnership assets to be maintained in trust was to ensure money to pay the sanction would be available. The tenor of the second sentence of the district court's April 30, 1993 order leads to this speculation. However, our speculation remains just that. We have no informed basis for evaluating the propriety of the district court's action because in the end we are left guessing as to the court's purpose. We remand this issue to the district court to reevaluate its rationale for not releasing these funds based on the changed landscape of this opinion and explain its reasoning in detail.

### VI.

■ Finally, the defendants argue the $402,527.98 supersedeas bond they filed to appeal the district court's sanction order supersedes the earlier $50,000 bond the court ordered on March 17, 1987. The defendants assert the second bond adequately protects Mr. Olcott's interests rendering the first bond unnecessary. We agree.

Originally, in a minute order of March 17, 1987, in conjunction with its original sanction against the defendants, the district court ordered them to post a $50,000 bond. The bond was posted on June 8, 1987. Subsequently, after the district court's final April 30, 1993 sanction order, on September 30, 1993, the defendants posted a supersedeas bond in the amount of $402,527.98, the total amount of the sanction.

The defendants filed their supersedeas bond pursuant to Fed.R.Civ.P. 62(d) to stay the district court's judgment against them pending appeal to this court. The purpose of requiring a supersedeas bond pending appeal "is to secure the judgment throughout the appeal process against the possibility of the judgment debtor's insolvency." *Grubb v. FDIC*, 833 F.2d 222, 226 (10th Cir.1987); *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir.1986). Typically, the amount of the bond matches the full amount of the judgment. *Id.; Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1155 (2d Cir.1986), *rev'd on other grounds*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). We have recog-

nized, "[d]istrict courts, however, have inherent discretionary authority in setting supersedeas bonds." *Miami Int'l*, 807 F.2d at 873. Accordingly, in *Miami Int'l*, we affirmed the district court's decision not to require a supersedeas bond in the full amount of the judgment. *Id.* at 874. The instant case presents the opposite factual scenario. The combination of the two bonds results in insolvency protection for Mr. Olcott in excess of the amount of his judgment. We fail to understand the necessity of maintaining the original $50,000 bond after the defendants posted their second bond in the full amount of the judgment. Therefore, we reverse the district court's decision not to exonerate the $50,000 bond.

### VII.

The district court's orders are **AFFIRMED IN PART, REVERSED IN PART,** and **REMANDED** for further proceedings consistent with this opinion.

