Mark W. PFENNINGER, M.D., and
Womens Health Care Specialists,
P.C., Plaintiffs,

v.

EXEMPLA, INC., Exempla Lutheran
Medical Center, Exempla Medical
Group of Colorado, Colorado Pre-
ferred Physicians Organization, Inc.,
Health Care Select, Inc., R. Douglas
Hunter, M.D., and Phillip Burstein,
M.D., Defendants.

No. CIV. A. 99–WY–1883–CB.

United States District Court,
D. Colorado.

Sept. 18, 2000.

Brice A. Tondre, Tondre & Schumacher, PC, Denver, CO, for Plaintiff.

Frederick Y. Yu, Yu, Stromberg, Cleveland, OH, P.C., Denver, CO, Gregory Clayton Parham, Yu, Stromberg, Cleveland, OH, P.C., Wheat Ridge, John D. Shively, Christopher Beall, Faegre & Benson, Kathleen M. Shea, John O. Martin, P.C., Denver, CO, Patrick O'Rourke, Montgomery, Little and McGrew, Englewood, CO, for Defendants Exempla, Inc., Exempla Lutheran Medical Center, R. Douglas Hunter, M.D., Phillip Burstein, M.D. Colorado Preferred Physicans Organization, Inc., and Health Care Select, Inc. Francis Major, M.D. Westside Womens Care, Gayle Crawford, M.D., Bonita Kolrud, M.D. and Daniel Saunders, M.D.

---

## MEMORANDUM OF DECISION AND ORDER

BRIMMER, District Judge.

Plaintiffs Mark W. Pfenninger, M.D. and Women's Health Care Specialists, P.C. bring this action against the above named Defendants alleging a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, violations of Dr. Pfenninger's due process and equal protection rights, defamation, and trade disparagement. Plaintiffs also allege tortious interference with contractual and business relations against Defendants Exempla, Inc., Exempla Lutheran Medical Center, and Drs. Hunter and Burstein. The Court exercises jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

The matter is currently before the Court on the following motions: (1) Defendants Exempla, Inc., Exempla Lutheran Medical Center, Exempla Medical Group of Colorado, and Drs. Hunter and Burstein's (collectively referred to as "Exempla Defendants") motion to dismiss or for summary judgment, (2) Defendants Colorado Preferred Physicians Organization, Inc. and Health Care Select, Inc.'s motion to dismiss or for summary judgment, (3) Defendants Colorado Preferred Physicians Organization, Inc. and Health Care Select, Inc.'s motion for partial summary judgment on Plaintiffs' due process claim, and (4) Plaintiffs' cross-motion for summary judgment on their due process claim. Pursuant to the Court's Order of July 26, 2000, all motions have been converted to motions for summary judgment to be disposed of pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the parties were given opportunity to supplement their motions and responses. Now, having considered the parties' briefs and oral arguments, and being fully advised in the premises, the Court hereby **FINDS** and **ORDERS** as follows:

### *Background*

The following facts are undisputed unless otherwise indicated. Dr. Pfenninger practiced obstetrics and gynecology in the Denver metropolitan area from approximately 1965 to 1998. At all times relevant to this action, Dr. Pfenninger operated his practice through Women's Health Care Specialists, P.C., and held medical staff privileges at Exempla Lutheran Medical Center, where he conducted approximately seventy percent of his practice.

Defendants Colorado Preferred Physicians Organization, Inc. ("CPPO") and Health Care Select, Inc. ("HCS") are independent physician associations ("IPAs") that function as non-profit corporations whose members include licensed physicians and other health care providers. These organizations negotiate with health

insurance carriers and other health care payor organizations to establish arrangements for their member physicians to be considered preferred providers by the payors. Dr. Pfenninger was a member of both CPPO and HCS until his memberships were suspended in or around April 1998.

Defendant Exempla, Inc. ("Exempla") is a non-profit heath organization that owns and operates various healthcare delivery facilities including Exempla Lutheran Medical Center ("Lutheran"). Exempla also employs a number of primary care physicians throughout the Denver metropolitan area, collectively referred to as Exempla Medical Group, Inc. At all times relevant to this action, Defendants Philip Burstein, M.D. and Robert Hunter, M.D. served as Vice President of Medical Affairs and Medical Staff President at Lutheran, respectively.

In October 1997, an ad hoc panel of the Lutheran Medical Staff Quality Improvement Committee ("MSQIC") reviewed one of Dr. Pfenninger's cases. Drs. Burstein and Hunter served on the ad hoc panel along with physicians Gayle Crawford, Robert Kongisberg, Ira Rifkin and Diane Stone. The MSQIC found that Dr. Pfenninger had performed a dilatation and curettage procedure ("D & C") in an examination room without benefit of proper monitoring equipment or an anesthesiologist. The MSQIC concluded that an examination room was an inappropriate location for a D & C and that Dr. Pfenninger's decision to perform the D & C under such circumstances "posed a great risk to the patient." (Pls.' Supp. Memo. in Opp'n Ex. B.) The MSQIC informed Dr. Pfenninger of its determination and forwarded its concerns to the Credentials Committee. Dr. Burstein served on the Credentials Committee along with physicians Bruce Waring, Dave Wahl, Jennifer Caskey, Howard Netz, Barbara Gablehouse, and Jim Thompson. At the time, Dr. Thompson also served as President of CPPO, and as a member of HCS's Board of Directors.

The Credentials Committee considered the matter and forwarded to the Medial Staff Executive Committee (the "Executive Committee," or, the "Committee") a recommendation that Dr. Pfenninger's medical staff privileges be suspended for twenty-nine days. Drs. Crawford and Hunter served as members of the Executive Committee along with physicians B. Abernathy, John Breckinridge, Robert Brown, Mark Conklin, James Hopfenbeck, P. Knott, C. Murphy, W. Saber, and C. Traut.

In February 1998, acting on the recommendation of the Credentials Committee, the Executive Committee reviewed Dr. Pfenninger's patient care history dating from 1977. The Committee also reviewed a summary of Dr. Pfenninger's actions in performing the D & C, which summary was presented by Dr. Crawford, then Chair of Lutheran's Ob/Gyn department, and a letter from Dr. Pfenninger regarding his conduct in that instance. The Executive Committee identified several concerns regarding Dr. Pfenninger's decision to perform the D & C under the prevailing circumstances, and noted a historical pattern of similar problems with Dr. Pfenninger's patient care. At the close of the session, the Committee voted to adopt the recommendation of the Credentials Committee and to further impose a one-year term of probation to follow the twenty-nine day suspension. Dr. Hunter informed Dr. Pfenninger of the Committee's decision via letter dated March 10, 1998. The letter summarized the Committee's findings and recommendations and informed Dr. Pfenninger of his right to challenge the recommendations under Lutheran's Fair Hearing Plan.

On April 1, 1998, Dr. Hunter sent a second letter informing Dr. Pfenninger that Lutheran Medical Staff had identified two recent, additional instances of perceived substandard care provided by Dr. Pfenninger. The letter accused Dr. Pfenninger of exercising "poor judgment" in undertaking "a procedure on a terminally ill patient that was beyond [his] capabili-

ties." (Pls.' Supp. Memo. in Opp'n Ex. F.) According to Dr. Hunter, Dr. Pfenninger "decided to proceed with major, very complex cancer surgery, surgery that should have been performed on a patient more medically stabilized and with the assistance of (or done by) a more qualified surgeon. There was no indication that surgery was required on an emergency basis." (*Id.*)

With regard to the second case, the letter accused Dr. Pfenninger of acting "to hasten a delivery by using the vacuum and then a procto-episiotomy and forceps when delivering a 5 pound, 10 ounce baby." (*Id.*) Dr. Hunter judged the instance as one "in which [Dr. Pfenninger's] impatience resulted in a more aggressive than necessary surgical procedure (procto-episiotomy), a procedure that is painful and rarely indicated in modern day obstetrics." (*Id.*)

Viewing these additional cases of perceived substandard care in the context of both Dr. Pfenninger's previous patient-care problems, and Dr. Pfenninger's own medical condition (Dr. Pfenninger had undergone cancer surgery in September 1997), Dr. Hunter recommended a leave of absence, during which Dr. Pfenninger's medical privileges at the hospital would be suspended. Dr. Hunter informed Dr. Pfenninger that if he (Dr. Pfenninger) declined the leave of absence, the Executive Committee would summarily suspend all hospital privileges pending an appeal.

In response to Dr. Hunter's letter, Dr. Pfenninger requested a hearing before the Executive Committee. The Executive Committee granted Dr. Pfenninger's request and convened a hearing on April 2, 1998. Committee members present at the April 2, 1998 hearing were Drs. Hunter, Crawford, Breckinridge, Brown, and Hopfenbeck, and Drs. Dennis Clifford, Mark Conklin, Joseph Morgan, Vernon Ritzman, Malcolm Tarkanian, and Brian Ridge. Also present were Dr. Pfenninger, Dr. Pfenninger's attorney, and Dr. William Goddard. Dr. Hunter provided a chronol-

ogy of events involving Dr. Pfenninger and reviewed the Committee's previous session and recommendation. Committee members reviewed Dr. Hunter's April 1, 1998 letter to Dr. Pfenninger and the medical charts of cases discussed in the letter. The Committee then heard testimony from Drs. Pfenninger and Goddard, and from Dr. Pfenninger's attorney. Dr. Goddard's testimony generally supported the view that Dr. Pfenninger's patient care met appropriate Ob/Gyn standards of care. Dr. Goddard specifically noted that while a procto-episiotomy is not commonly used, the procedure is used when necessary. Dr. Goddard further stated that had he himself seen the cancer patient he would not have called a surgeon in to scrub with him. Although Dr. Pfenninger did do harm to the cancer patient's ureters, he stated that he did not believe he harmed the patient. Drs. Pfenninger, Goddard, and Crawford were the only board certified Ob/Gyns present at the hearing. Dr. Crawford did not state her opinion regarding the appropriate Ob/Gyn standard of care. At the conclusion of the two hour hearing, the Executive Committee voted unanimously to recommend termination of Dr. Pfenninger's medical staff privileges and to summarily suspend those privileges pending an appeal. Dr. Crawford abstained from voting.

In a letter dated April 3, 1998, Dr. Hunter outlined for Dr. Pfenninger the Committee's reasons for approving a summary suspension, namely,

a pattern of substandard professional performance in which you have exercised poor judgment in the care of patients, acted with haste, and have developed an ineffectual relationship with nursing staff that causes them to hesitate to confront you when you make requests that are not considered within the normal practice.

(Pls.' Combined Memo. in Opp'n Ex. 9.) The April 3, 1998 letter also detailed the three recent incidents of what the Committee deemed to be substandard care, and

informed Dr. Pfenninger of the Committee's opinion that summary suspension was "necessary to protect patients." (*Id.*) The letter informed Dr. Pfenninger of his right to challenge the Committee's recommendation under Lutheran's Fair Hearing Plan.

Upon notification of Committees's decision, Dr. Pfenninger, in turn, notified CPPO and HCS that his staff privileges at Lutheran had been revoked. Both CPPO and HCS separately, and without any hearing, suspended Dr. Pfenninger from their panels of physicians. Each organization requires their physicians to maintain medical staff privileges at Lutheran as a condition of membership. Revocation of Dr. Pfenninger's staff privileges at Lutheran and subsequent loss of CPPO and HCS membership status resulted in an immediate loss of approximately seventy percent of patient business at Women's Health Care Specialists.

Pursuant to the Fair Hearing Plan of the Lutheran Medical Staff Bylaws, Dr. Pfenninger requested a hearing to review the Executive Committee's decision. After hearing testimony from several witnesses, the Hearing Panel concluded that summary suspension of Dr. Pfenninger's privileges was unwarranted. Section 7.1–3 of the Lutheran Medical Center Credentials Policy and Procedure provides: "Summary suspension shall be initiated whenever a practitioner's conduct requires that immediate action be taken to prevent immediate danger to life, or substantial likelihood of injury to patients, employees or other persons present in the hospital." (Pls.' Supp. Memo. in Opp'n Ex. K.) The Panel noted that some of Dr. Pfenninger's care may have been controversial, that he may have made some mistakes, and that his record keeping was sometimes inadequate, but found no compelling evidence to support summary suspension or revocation of staff privileges. Instead, the Hearing Panel recommended a period of probation and continuous monitoring of Dr. Pfenninger's cases.

On June 22, 1998, the Executive Committee considered the recommendations of the Hearing Panel. Although some members of the Committee wanted to reject the Panel's recommendations outright, the Committee voted to have an outside expert in the field of obstetrics and gynecology, Dr. Philip Schmidt, conduct a review of the care given to a number of Dr. Pfenninger's patients. The Executive Committee did not revoke its earlier decision to summarily suspend Dr. Pfenninger's privileges.

On July 21, 1998, the Executive Committee reviewed its previous findings, the findings of the Hearing Panel, and the report of Dr. Schmidt. In his report, Dr. Schmidt found that of the fourteen cases he reviewed, eight were outside the appropriate standard of care, two were questionable, and four were handled appropriately. Dr. Schmidt did not testify in person. At the conclusion of this hearing, the Executive Committee decided that its original summary suspension was warranted. The Committee specifically rejected a number of the Hearing Panel's findings regarding the quality of Dr. Pfenninger's care. Despite these rejections, the Executive Committee voted to reinstate Dr. Pfenninger's staff privileges, but only on condition that Dr. Pfenninger agree to a plan of continuous monitoring of his patient care, that he complete an educational course in the use of vacuum extractors, and that he agree to release from liability all parties involved in the peer review proceedings and subsequent monitoring of patient care.

Dr. Pfenninger refused to accept these conditions and appealed the decision of the Executive Committee to Exempla's Board of Directors. The Board appointed a panel of three members to review the record and hear oral arguments from both Dr. Pfenninger and the Executive Committee. After reviewing the record and hearing oral arguments, the panel made a recommendation to the full Board of Directors. On August 31, 1998, the Board of Directors issued its final decision, ruling that the Executive Committee's decision to

summarily suspend Dr. Pfenninger was warranted:

> [T]he [Executive Committee] had before it three cases during a seven month period—the last two only one month apart—which were determined to involve poor judgment and care that was marginal at best and outside the standard of care at worse. This, coupled with a ten year history of similar cases, poor documentation which showed few signs of improvement in spite of repeated counseling, an unacceptably high rate of 3rd and 4th degree perineal lacerations for vaginal deliveries, and a demonstrated pattern for acting in haste leading to comprised [sic] patient care in a number of documented cases, provided the [Committee] with a sound basis for the determination that allowing Dr. Pfenninger to continue to practice in this manner posed a substantial likelihood of injury to [Lutheran] patients.

(Pls.' Supp. Memo. in Opp'n Ex. N.) The Board also approved the Executive Committee's recommendation that Dr. Pfenninger's staff privileges be reinstated only upon satisfaction of the conditions outlined above.[1] While still under suspension, Dr. Pfenninger announced his retirement from practice in approximately September 1998.

In approximately October 1998, the Exempla Board of Directors filed an Adverse Action Report with the Colorado Board of Medical Examiners as required by the federal Health Care Quality Improvement Act, 42 U.S.C.A. § 11133 (West 1995). The Board of Medical Examiners in turn reported the adverse action to the National Practitioners Data Bank. The Adverse Action Report incorrectly classified the peer review action as "LICENSE REVOKED: INCOMPETENCE / MALPRACTICE / NEGLIGENCE." (Pls.' Combined Memo. in Opp'n Ex. 13.) After Dr. Pfenninger complained of the misclassification, the Board of Directors filed a second report to correct the inaccuracies.

The correction report classified the peer review action as "[PRIVILEGES] SUSPENDED: OTHER." (*Id.* Ex. 14.)

On September 16, 1998 Plaintiffs filed a civil action in state court against many of the same Defendants in this action. Plaintiffs alleged in the state action that Defendants conspired to cause false charges to be made against Dr. Pfenninger. The trial court dismissed Plaintiffs' case for failure to exhaust administrative remedies, which dismissal was reversed on appeal. *See Pfenninger v. Exempla Inc.*, 12 P.3d 830 (Colo.Ct.App.2000).

While his state court appeal was pending, Dr. Pfenninger petitioned the Colorado Committee on Anticompetitive Conduct ("CAC") for review of the Board of Director's final action. Dr. Pfenninger complained to the CAC that the peer review process resulted from anticompetitive conduct in furtherance of a conspiracy to eliminate Dr. Pfenninger and Women's Health Care Specialists as a competitor for the delivery of Ob/Gyn services in the Denver area. The CAC held an evidentiary hearing that included presentation of numerous exhibits and testimony from seven witnesses. After considering the record of Lutheran's peer review of Dr. Pfenninger's patient care and the evidence presented at the hearing, the CAC issued its final order. The CAC found that Dr. Pfenninger had failed to establish the existence of a contract or conspiracy to restrain trade, an adverse effect on competition, or any unreasonable anticompetitive conduct. The CAC also found no evidence from which to conclude "that the peer review process was conducted in a manner other than in good faith," and concluded that the Board of Director's decision in support of the Executive Committee "was made in good faith, for socially legitimate reasons which outweighed any actual or potential anticompetitive effects." (Br. in Supp. of Exempla Defs.' Mot. Ex. H ¶ 33.) Although Colora-

---

1. In fact, the Board of Directors amended the conditions to require completion of the educational course in the use of vacuum extractors before reinstatement of staff privileges.

do law provides for review of final CAC action in the Colorado Court of Appeals, *see* Colo.Rev.Stat. § 12–36.5–106(10) (1999), Dr. Pfenninger did not seek review of the CAC's decision in his case.

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there exists a genuine issue of material fact, courts must view the evidence in the light most favorable to the nonmoving party. *See Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir.1998) (en banc). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621 (10th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### Analysis

#### A. Antitrust Claim

Plaintiffs allege that Exempla Defendants, CPPO, and HCS entered into an agreement under which CPPO and HCS "are required to refuse to permit physicians who do not utilize the facilities of Lutheran for treatment of their patients to provide services to any patients who are under contract to receive medical service from HCS and CPPO contractors." (Pls.' Second Am. Compl. ¶ 14.) The purpose of the alleged agreement, according to Plaintiffs, "is to reduce the number of physicians competing for the health care dollar on the west side of Denver in order to stabilize and/or increase prices for [medical] services." (*Id.* ¶ 18.) Plaintiffs allege that this conduct constitutes "a *per se* vio-

lation of Section of 1 of the Sherman Act." (*Id.* ¶ 38.)

Section 1 of the Sherman Act provides, in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C.A. § 1 (West 1997). Despite the statute's broad language, § 1 generally prohibits only those restraints that are deemed unreasonable. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The Supreme Court has outlined two analytical approaches for determining whether particular conduct unreasonably restrains trade: the *per se* rule, and the rule-of-reason. In general, courts apply the rule-of-reason analysis unless the plaintiff makes a threshold showing that "the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Id.* (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). "The decision to apply the *per se* rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." *Id.* at 289–90, 105 S.Ct. 2613 (quotation and citation omitted). Here, the Court must decide whether the alleged agreement between Exempla and Lutheran on the one hand, and CPPO and HCS on the other, to require hospital staff privileges at Lutheran as a condition of membership to the latter organizations constitutes a *per se* antitrust violation.

■ The Tenth Circuit recently highlighted three important factors for determining whether to invoke the *per se* rule. *See Diaz v. Farley*, 215 F.3d 1175, 1182–85 (10th Cir.2000). The factors are: (1) whether the defendants "hold a dominant position in a relevant market," (2) whether the defendants possess "exclusive access to an element essential to effective competition," and (3) the existence of "plausible arguments concerning procompetitive effects" of the conduct. *Id.* at 1183 (quotation omitted).

■ In this case, Plaintiffs have neither alleged nor produced any evidence to show that the Defendants hold a dominant market position. Plaintiffs' Second Amended Complaint alleges an unlawful conspiracy between Defendants to reduce competition "on the west side of Denver." Plaintiffs, however, suggest no basis for this description of the market, and, more importantly, provide absolutely no evidence to indicate that Defendants enjoy market dominance even in this limited geographic area. Defendants, meanwhile, have provided uncontested expert testimony that Lutheran receives, at best, only thirteen and one-half percent of patient admissions in the relevant market, which Defendants' expert defines as the geographic area from which Lutheran draws seventy-five percent of its patient business. (Lynk Aff. Ex. B, ¶¶ 40 and 41.) The report of Defendants' expert also shows that CPPO and HCS jointly possess less than fourteen percent of the total IPA membership in the Denver metropolitan area. (*Id.* ¶ 48.) The Court has no reason to doubt the findings of Defendants' expert and agrees with Defendants that these percentages are too low to suggest even a remote possibility of market dominance.

Nor have Plaintiffs offered any evidence to show that Defendants control access to an element essential to effective competition. Plaintiffs apparently contend that staff privileges at Lutheran, and membership in CPPO and HCS, are essential to effective competition for patient dollars on the west side of Denver. The record, however, contains no evidence to support this contention. To the contrary, Defendants have offered undisputed expert testimony that of all inpatient revenue originating from the geographic area represented by Lutheran's own zip code, over fifty percent of such revenue goes to hospitals outside that geographic area. (*Id.* ¶ 35.) In other words, more than half of all patients living in the immediate vicinity of Lutheran actually obtain their medical services at other hospitals. Furthermore, after losing staff privileges at Lutheran and membership in CPPO and HCS, Dr. Pfenninger remained free to continue his Ob/Gyn practice through another hospital, (*see* Pfenninger Dep. at 12.), and to otherwise compete for Ob/Gyn patients in the Denver area. It may be true that Dr. Pfenninger's suspension and loss of membership status caused Plaintiffs to lose seventy percent of their patients, but this fact has no bearing on whether Defendants possess exclusive access to an element essential to effective competition for patient services on the west side of Denver. Rather, it merely demonstrates that Plaintiffs themselves were once, in effect, co-conspirators to the agreement of which they now complain.

Finally, Defendants have put forth plausible arguments concerning the procompetitive effects of the requirement that IPA member physicians maintain hospital privileges at a particular hospital as a condition of membership in such organizations. They point out, for example, that

> [t]hird-party payors and insurance plans are able to obtain lower prices and provide more attractive products to employers by requiring IPAs, such as CPPO and HCS, to designate a primary hospital to which the IPA's physicians will refer their patients. Employers, in turn, are able to provide better health coverage to their employees.

(CPPO and HCS' Supp. Br. at 12). Once again, these justifications are supported by expert testimony. (*See* Lynk Aff. Ex. B, ¶¶ 18–20.) Plaintiffs have not provided

any counter argument and the Court finds no apparent reason to question the Defendants' justifications.

■ In sum, Plaintiffs have failed to present a threshold case that the Defendants' behavior falls into the category of conduct likely to have predominantly anticompetitive effects. Thus, Plaintiffs cannot invoke the *per se* rule and must instead establish their antitrust claim under the rule-of-reason. *See Northwest Wholesale,* 472 U.S. at 289, 105 S.Ct. 2613. Under the rule-of-reason analysis, the defendants' conduct is presumed legal, but the plaintiff may demonstrate that, under the circumstances, the conduct imposes "an unreasonable restraint on competition." *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Here, Plaintiffs have failed to plead a rule-of-reason cause of action and have offered only conclusory allegations, unsupported by any evidence in the record, that Defendants' conduct has limited competition for health care delivery in a relevant market. Accordingly, the Court finds that Plaintiffs have failed to establish a genuine issue of material fact, and that Defendants are entitled to judgment as a matter of law on Plaintiffs' antitrust claim.

■ Plaintiffs' counsel has submitted an affidavit, apparently pursuant to Rule 56(f), requesting "that the Court defer any ruling on the case which relates to the relevant markets and the impact on competition until Exempla [Defendants have] produced" documents that Plaintiffs' counsel believes "will shed light upon and support application of the *per se* rule in this case." (Tondre Aff. ¶¶ 4, 5.) Rule 56(f) of the Federal Rules of Civil Procedure provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The district courts exercise discretion in deciding whether to grant a Rule 56(f) motion. *See Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1522 (10th Cir.1992). To obtain relief under Rule 56(f), a party must provide more than a mere assertion "that the evidence supporting [the party's] allegation is in the hands of the [opposing party]." *Weir v. Anaconda Co.,* 773 F.2d 1073, 1083 (10th Cir.1985). Rather, the party must identify with some degree of specificity the facts it believes will be uncovered through additional discovery. *See Jensen v. Redev. Agency,* 998 F.2d 1550, 1554 (10th Cir. 1993). In this case, Plaintiffs have failed to identify what facts useful to opposing Defendants' motions for summary judgment they believe will be uncovered through additional discovery. Instead, Plaintiffs' Rule 56(f) affidavit contains only conclusory allegations that Exempla Defendants have withheld relevant information. Such allegations do not warrant Rule 56(f) relief and the Court declines to grant such relief in this instance.

## B. Civil Rights Claims

### 1. Denial of Due Process

A civil rights plaintiff proceeding under 42 U.S.C. § 1983 upon allegations of a deprivation of due process rights must allege and prove that "(a) some person has deprived him of a federally protected right, and (b) the person who has deprived him of that right acted under color of state law." *Houston v. Reich,* 932 F.2d 883, 890 (10th Cir.1991). Defendants contend that Plaintiffs can establish neither element. Because the Court finds, as set out below, that Plaintiffs have failed to prove deprivation of a federally protected right, it does not address the color of law requirement.

■ To trigger the due process protections of the Fourteenth Amendment, Plaintiffs must show that Dr. Pfenninger

possesses either a property or liberty interest in the benefits of which he was deprived. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A property interest "is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quoting *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)). The existence of a property right depends largely upon the extent to which a statute or governing bylaws contains mandatory language that restricts the discretion of the decision maker. "If the decision to confer a benefit is unconstrained by particularized standards or criteria, no entitlement exists." *Allen v. City of Beverly Hills,* 911 F.2d 367, 370 (9th Cir.1990) (quotation omitted). Whether the facts establish the existence of a property interest is a question of law. *See Tarabishi v. McAlester Reg'l Hosp.,* 827 F.2d 648, 652 (10th Cir.1987).

■■■■ Plaintiffs allege that Dr. Pfenninger has a recognized property interest in hospital staff privileges at Lutheran. Plaintiffs, however, point to no substantive restrictions on Lutheran's authority to revoke such privileges. The language found in Lutheran's Credentials Policy and Procedure, "Summary suspension shall be initiated ...," provides a positive grant of authority, not a restriction on authority. With respect to statutory restrictions, the Court recognizes that Colorado law grants the CAC limited power to reverse final peer review actions resulting from unreasonable anticompetitive conduct. *See* Colo.Rev.Stat. § 12–36.5–106(9)(k) (1999). A reasonableness restriction, however, provides no claim of entitlement to hospital privileges. *See Jacobson v. Hannifin,* 627 F.2d 177, 180 (9th Cir.1980) (finding no protected property interest where the only substantive restriction was a requirement that the basis for decision be reasonable). Moreover, while Dr. Pfenninger was clearly entitled to numerous procedural protections before removal of his privileges, it is well established that "procedural protections alone do not create a protected property right in future employment." *Asbill v. Housing Auth. of Choctaw Nation,* 726 F.2d 1499, 1502 (10th Cir.1984); *see also Hennigh v. City of Shawnee,* 155 F.3d 1249, 1254 (10th Cir.1998) ("Procedural detail in a statute or regulation, standing alone, is not sufficient to establish a protected property interest in an employment benefit."). Thus, Plaintiffs have failed to satisfy their burden of demonstrating the existence of a constitutionally-protected property right, and must rely on deprivation of a protected liberty interest to establish a due process claim under § 1983.

■■■■ Plaintiffs allege that Defendants' actions deprived Dr. Pfenninger of his freedom to earn a living. Plaintiffs are correct that the liberty interest protected by the Constitution includes an individual's "freedom to earn a living." *Setliff v. Memorial Hosp.,* 850 F.2d 1384, 1396 (10th Cir.1988) (quoting *Lentsch v. Marshall,* 741 F.2d 301, 303 (10th Cir.1984)); *see also Workman v. Jordan,* 32 F.3d 475, 480 (10th Cir.1994) (recognizing a liberty interest in reputation as it affects one's interest in continued employment). However, "[a] liberty interest is not violated when one is discharged without public disclosure of the reasons for the discharge." *Dickeson v. Quarberg,* 844 F.2d 1435, 1440 (10th Cir. 1988). To be actionable, statements accompanying a discharge, or in this case, a removal of hospital staff privileges (1) "must impugn the good name, reputation, honor, or integrity of the [individual]," (2) "must be false," (3) "must foreclose other employment opportunities," and (4) "must be published." *Workman,* 32 F.3d at 481 (citations omitted).

■■■ In this case, Plaintiffs have failed to produce facts demonstrating deprivation of a liberty interest in Dr. Pfenninger's freedom to earn a living. Plaintiffs have offered no evidence to demonstrate that Defendants published any false statements

in connection with either the peer review process or the suspension of membership in CPPO and HCS. With respect to the initial Adverse Action Report filed at the conclusion of the peer review process, the Court acknowledges that statements contained in the report were both false and impugned Dr. Pfenninger's good name and reputation. Contrary to statements made in the initial report, Dr. Pfenninger's medical license had not been revoked, and there had been no finding that Dr. Pfenninger had committed malpractice, had been negligent, or that he was incompetent. However, the Court finds that Plaintiffs have failed to establish that the erroneous Adverse Action Report foreclosed other employment opportunities.

Under the federal Health Care Quality Improvement Act, see 42 U.S.C.A. §§ 11111–11152, any health care entity that takes final peer review action adversely affecting a physician's hospital privileges for a period longer than thirty days must report that final action to the state board of medical examiners, see 42 U.S.C.A. § 11133(a)(1) (West 1995). The board of medical examiners must then report this information to the National Practitioner Data Bank. See 45 C.F.R. § 60.9(b). The National Practitioner Data Bank acts as a clearinghouse for information about individual physicians. Access to information contained in the Data Bank is not available to the general public, but is restricted to a limited group of persons and entities. See 45 C.F.R. § 60.11(a). Where communications are not made public, they cannot form the basis of a claim for impairment in one's good name and reputation. See Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). While it is true that the report of final action against Dr. Pfenninger is available to any state licensing board or health care entity to which he applies for membership or practice privileges, see 45 C.F.R. § 60.11(a)(3), (4), Plaintiffs have produced no evidence indicating that any individual, or entity, sought access to the report. Dr. Pfenninger retired from practice in September 1998. Prior to his retirement, he sought neither license to practice in another state, nor privileges at another Colorado health care entity. Thus, the false statements contained in the initial Adverse Action Report never harmed Dr. Pfenninger's ability to seek other employment, and Dr. Pfenninger cannot claim deprivation of a liberty interest based on such statements. Moreover, Exempla's Board of Directors filed a supplemental report that corrects the inaccuracies of the initial report, and Plaintiffs do not dispute the veracity of the corrected report.

To support their claim of deprivation of a liberty interest, Plaintiffs rely heavily on a case decided by the Colorado Court of Appeals, Nicholas v. North Colorado Medical Center, Inc., No. 98CA1407, 1999 WL 1128662, as modified on denial of rehearing (Colo. Ct.App. April 13, 2000). The plaintiff in Nicholas brought a § 1983 claim against the defendant hospital and certain of its administrators over the defendants' decision to suspend his hospital privileges. The court held that "[b]ecause the suspension of privileges seriously injured [the plaintiff's] professional reputation and directly affected his ability to find employment as a physician, [the plaintiff] had a liberty interest in his staff privileges." Id. at *5. This Court is not bound by Nicholas. To the extent Nicholas holds that revocation of hospital privileges alone constitutes deprivation of a liberty interest, the Court finds that such holding is inconsistent with the law of this circuit, see, e.g., Setliff, 850 F.2d at 1396 (holding that reduction in prospective employment possibilities at other hospitals does not constitute deprivation of a liberty interest), and declines to follow it. The record in this case contains no indication that Dr. Pfenninger was not at liberty to continue practicing medicine. To the contrary, the record shows that he maintained staff privileges at another Denver-area hospital until his retirement in approximately September 1998. Absent some showing that

Defendants' actions foreclosed Dr. Pfenninger's ability to practice his profession, he has not been deprived of a liberty interest.

In sum, Plaintiffs have failed to establish the existence of a property right in hospital staff privileges, and have failed to put forth sufficient facts to create a jury question whether Defendants deprived Dr. Pfenninger of a liberty interest. Accordingly Plaintiffs' § 1983 due process claim must be dismissed. For the same reasons, Plaintiffs' motion for partial summary judgment on this claim must be denied.

**2. Denial of Equal Protection**

■ To establish a § 1983 claim for violation of Dr. Pfenninger's right to equal protection, Plaintiffs must plead and prove that the relevant decision-makers were motivated, at least in part, by a discriminatory intent or purpose. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Absent some allegation of improper classification, there is no § 1983 equal protection cause of action. *See Shortino v. Wheeler,* 531 F.2d 938, 939 (8th Cir.1976). Plaintiffs' Second Amended Complaint contains no allegations that Defendants were motivated by a discriminatory intent or purpose, and Plaintiffs have produced no evidence to that effect. Therefore, Defendants are entitled to summary judgment on this claim.

**C. State Law Claims**

Having ruled that Defendants are entitled to judgment on Plaintiffs' federal causes of action, the Court has discretion whether to continue to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See Olcott v. Delaware Flood Co.,* 76 F.3d 1538, 1550 (10th Cir.1996). In this case, the Court shall exercise its discretion in favor of maintaining jurisdiction. All parties have expended considerable resources on the instant motions and Plaintiffs' remaining claims can be resolved

without further proceedings. Under these circumstances, the Court finds that the interests of fairness, convenience, and judicial economy warrant continued exercise of jurisdiction over Plaintiffs' state law claims.

While Exempla Defendants seek summary judgment on Plaintiffs' state law claims on grounds of qualified immunity under federal and state statutes, HCS and CPPO primarily attack these claims directly on the merits. Because the Defendants' motions raise distinct legal issues, the Court shall consider them separately.

**1. CPPO and HCS's Motion for Summary Judgment on Plaintiffs' State Claims**

■ The only state law claims facing Defendants CPPO and HCS are Plaintiffs' claims for defamation and trade disparagement. Plaintiffs allege that Dr. Pfenninger has been defamed and economically disadvantaged by false statements relating to his loss of staff privileges made to Lutheran employees, the National Practitioner Data Bank, and the Colorado Board of Medical Examiners. The elements of a cause of action for defamation are: "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Walters v. Linhof,* 559 F.Supp. 1231, 1236 (D.Colo. 1983) (citing Restatement (Second) of Torts § 558 (1979)). With respect to trade disparagement, Colorado has adopted the following definition from the Restatement:

"One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or

either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard to its truth or falsity."

*Teilhaber Mfg. Co. v. Unarco Materials Storage,* 791 P.2d 1164, 1166 (Colo.Ct.App. 1989) (quoting Restatement (Second) of Torts § 623(A) (1976)). In this case, Plaintiffs have produced no evidence tending to show that either CPPO or HCS published any false statements regarding Dr. Pfenninger. The record contains no indication that these organizations participated in either the peer review process itself or in the preparation or filing of the Adverse Action Report. Absent evidence of publication, Plaintiffs can maintain neither a defamation nor a disparagement cause of action against these Defendants.

Moreover, Plaintiffs' allegations of a conspiracy to defame and to disparage are just that, allegations. In *Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486 (Colo. 1989), the Colorado Supreme Court listed five elements necessary to establish a civil conspiracy in Colorado. "There must be: (1) two or more persons, . . . (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Id.* at 502. (quotations omitted). Nothing in the record would support a conclusion that CPPO and HCS had reached "a meeting of the minds" with Exempla Defendants regarding any statements made in the course of the peer review process or in the preparation or filing of the Adverse Action Report. Therefore, Plaintiffs' claim of a conspiracy to defame and to disparage must fail as well.

### 2. Exempla Defendants' Motion for Summary Judgment on Plaintiffs' State Claims

Exempla Defendants contend they are immune from liability with respect to all but Plaintiffs' civil rights claims under both the Federal Health Care Quality Improvement Act (the "HCQIA," or, the "Act"), 42 U.S.C.A. §§ 11111–11152, and the Colorado Professional Review Act, Colo.Rev.Stat. §§ 12–36.5–101 to –106.

### a. Federal Immunity

In 1986, Congress enacted the HCQIA in an effort to improve medical care by decreasing the occurrence of medical malpractice and by restricting the ability of incompetent physicians to move from state to state without disclosure of prior incompetent performance. *See* 42 U.S.C.A. § 11101 (West 1995). Congress specifically sought to improve the quality of medical care through effective professional peer review. *See id.* To encourage participation in the peer review process, the HCQIA "creates a form of protection from liability in damages for hospitals and peer review participants." *Manion v. Evans,* 986 F.2d 1036, 1037 (6th Cir.1993). The Act provides, in part:

If a professional review action . . . of a professional review body meets all the standards specified in section 11112(a) of this title, . . .—(A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C.A. § 11111(a)(1). The Act defines "professional review body" as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." *Id.* § 11151(11). Under these provisions of the Act, Defendants Exempla, Inc., Exempla Lutheran Medical Center, and Drs. Hunter and Burstein are

entitled to qualified immunity if the standards set out in § 11112(a) have been satisfied.[2] Section 11112(a) requires that the peer review action

be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id.* § 11112(a). Importantly, a review action is "presumed to have met the preceding standards" unless the plaintiff challenging the action establishes by a preponderance of the evidence that any one of the above four requirements was not met. *Id.* "Courts apply an objective standard in determining whether a peer review action was reasonable under 42 U.S.C. § 11112(a)." *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir.1996).

**b. State Immunity**

The Colorado legislature also recognized the need to encourage professional peer review in the health care industry. To that end, the legislature enacted the Colorado Professional Review Act ("CPRA"), which provides qualified immunity to those who participate in the peer review process. Part I of the CPRA provides, in part:

(1) A member of a professional review committee, a witness before a profes-

sional review committee, or any person who files a complaint or otherwise participates in the professional review process shall be immune from suit in any civil or criminal action, including antitrust actions, brought by a physician who is the subject of the review by such professional review committee, if such member made a reasonable effort to obtain the facts of the matter as to which he acted, acted in the reasonable belief that the action taken by him was warranted by the facts, and otherwise acted in good faith within the scope of such professional review committee process and if such witness or participant acted in good faith within the scope of such professional review committee process.

(2) The governing board, the individual members of such board, and the entity which has established a peer review committee pursuant to section 12–36.5–104 shall be immune from suit for any damages in a civil or criminal action, including antitrust actions, brought by a physician who is the subject of any action taken by such board or members if such board or its members, acting as individuals, act in good faith. Good faith shall include reliance upon the recommendations of the review committee, but good faith shall not be presumed if the board or a member has knowledge concerning the review in question which would cause such reliance to be unwarranted. Good faith shall also require that the board otherwise acted in good faith, including the consideration of any facts not previously available to and considered by the peer review committee, and that the board acted in reasonable belief that the action taken was warranted by the facts.

2. There is no evidence that Defendant Exempla Medical Group of Colorado ("EMG") participated in the peer review of Dr. Pfenninger's patient care. Thus, EMG is not entitled to immunity under the HCQIA. However, the only state claims remaining against EMG are Plaintiffs' claims for defamation and dispar-

agement. Because the record is void of any indication that EMG published any defamatory or disparaging statement regarding Dr. Pfenninger, the Court finds that EMG is entitled to judgment as a matter of law on these remaining claims.

Colo.Rev.Stat. § 12–36.5–105 (1999). Part II of the CPRA is designed to "comply with the provisions of the federal [HCQIA]." *Id.* § 12–36.5–201. Part II provides immunity from damage liability to professional review committees and those who participate in the review process. *Id.* § 12–36.5–203.

### c. Collateral Estoppel

▮▮▮▮ Exempla Defendants argue that the good faith issue—and therefore, the qualified immunity issue—has been conclusively decided by the CAC, and that the doctrine of collateral estoppel bars Plaintiffs from relitigating that issue here. The Court disagrees. Collateral estoppel applies only where the party relying on the doctrine establishes:

> (1) the issue is identical to the issue litigated in the prior proceeding; (2) there was a final judgment on the merits in the prior proceeding; (3) the party against whom preclusion is asserted was a party to or in privity with the party to the prior litigation; and (4) the party to be precluded had a full and fair opportunity to litigate the issue.

*Coffey v. Dean Witter Reynolds, Inc.,* 961 F.2d 922, 925 (10th Cir.1992). While the CAC did determine that peer review process was conducted in good faith, that determination has no bearing on the question of qualified immunity under the HCQIA. "[A] defendant's subjective bad faith is irrelevant" to the question of qualified immunity under the federal scheme. *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 635 (3d Cir.1996); *see also Brown,* 101 F.3d at 1333 (holding that § 11112(a)(1) imposes an objective standard); *accord Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1323 (11th Cir.1994); *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir.1992). Thus, with respect to federal immunity, the CAC's good faith determination has no preclusive effect.

Nor does the CAC's good faith determination have preclusive effect with respect to state law immunity. Under the CPRA, any physician who believes that a final board action suspending or restricting staff privileges resulted from unreasonable anticompetitive conduct is entitled to direct review of that action by the CAC. *See* Colo. Rev. Stat § 12–36.5–106(7) (1999). The statute, however, limits the CAC's review "to the sole issue of whether such final board action resulted from unreasonable anticompetitive conduct." *Id.* The statute further provides that "[n]othing in this article shall preclude a physician or health care provider otherwise aggrieved by the final action of a governing board from seeking other remedies available to them by law, except as provided in subsection (7) of this section." *Id.* § 12–36.5–106(8). This language makes it abundantly clear that the CAC has no authority to determine whether participants in a professional peer review are entitled to qualified immunity under the CPRA. The CAC's mandate is limited to the question of anticompetitive conduct. *See Nicholas v. North Colo. Med. Ctr.,* 902 P.2d 462, 468 (Colo.Ct.App.1995). Although the subjective good faith of peer review participants might be an important factor in determining the existence of anticompetitive behavior, the two issues are not identical. A peer review participant who discriminates against a physician under review on the basis of race or gender, for example, would certainly be acting in bad faith, but would not necessarily run afoul of the CAC. Thus, even though the CAC determined, as part of its analysis on the issue of unreasonable anticompetitive conduct, that Exempla Defendants acted in good faith, that determination cannot be deemed a "final judgment on the merits" on the question of qualified immunity under the CPRA. Accordingly, the CAC's determination that Exempla Defendant's acted in good faith has no preclusive effect in this action.

### d. Issues of Material Fact

▮▮▮▮ The Court next addresses whether Plaintiffs have demonstrated a material issue of fact with respect to De-

fendants' claim of qualified immunity.[3] With respect to federal law, the HCQIA creates a presumption of immunity, which means that the party contesting immunity "bears the burden of proving that the peer review process was not reasonable." *See Bryan,* 33 F.3d at 1333. In addressing HCQIA immunity at the summary judgment stage, the court must "determine whether the plaintiff 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of [the] HCQIA.'" *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 839 (3rd Cir.1999) (quoting *Bryan,* 33 F.3d at 1334); *see also Austin,* 979 F.2d at 734 ("Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?").

■■■ The parties do not dispute that Exempla Defendants took professional review actions against Dr. Pfenninger in this case. The Court finds the following actions meet the HCQIA's definition of "professional review action": (1) the Executive Committee's summary suspension of Dr. Pfenninger's privileges, (2) the Executive Committee's recommendation that Dr. Pfenninger's privileges be reinstated only upon Dr. Pfenninger's agreement to numerous conditions, and (3) the Exempla Board of Director's decision approving the Executive Committee's recommendation.[4]

### (1) Summary Suspension of Privileges

### (a) Reasonable belief that action was in furtherance of quality health care

The first prong of the HCQIA immunity test is satisfied where the participants, "'with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'" *Bryan,* 33 F.3d at 1334–35 (quoting H.R.Rep. No. 99–903, at 10 (1986), *reprint-*

---

**3.** Although Exempla Defendants did not formally raise this argument in their motion, it is well established that "a district court in appropriate circumstances may grant summary judgment on a ground not formally raised in a summary judgment motion." *Howell Petroleum Corp. v. Leben Oil Corp.,* 976 F.2d 614, 620 (10th Cir.1992). Where a party is on notice that it must come forward with all of its evidence, a district court may enter summary judgment *sua sponte. See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civ.3d* § 2720, at 339–55 (3d ed.1998) (discussing standards and justifications for entry of summary judgment *sua sponte*). In this case, Plaintiffs are clearly on notice that they must come forward with all their evidence. Exempla Defendants' reply brief clearly states that "Plaintiffs have failed to raise any genuine issue of fact to pierce the immunity provisions of the federal and state peer review laws." (Reply in Supp. of Exempla Defs.' Mot. at 1.) Perhaps more importantly, Plaintiffs have in fact briefed this issue and filed numerous exhibits including affidavits and hearing transcripts. Plaintiffs contend, for example, that "[t]he principles set forth in *Brown v. Presbyterian Hospital,* . . . coupled with the facts alleged in this action and supported by the material appended hereto, clearly create a fact issue with respect to whether the defendants are entitled to the qualified immunity provided by the statutes." (Pls.' Combined Memo. in Opp'n at 49.) Under the circumstances, the Court finds that *sua sponte* disposition of this issue is appropriate.

**4.** Under the HCQIA,

> [t]he term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C.A. § 11151(9) (West 1995).

*ed in* 1986 U.S.C.C.A.N. 6384, 6393). Here, the Executive Committee summarily suspended Dr. Pfenninger's staff privileges after a review of Dr. Pfenninger's recent cases raised concerns regarding patient safety. The Committee found "a pattern of substandard professional performance" and concluded that summary suspension was "necessary to protect patients." Plaintiffs have produced no evidence to rebut the presumption that the Executive Committee reasonably believed summary suspension of Dr. Pfenninger's privileges was in furtherance of quality health care.

### (b) Reasonable effort to obtain facts

To qualify for immunity, the HCQIA requires peer reviewers to make a reasonable effort to obtain the relevant facts. *See* 42 U.S.C.A. § 11112(a)(2). The relevant inquiry "is whether the totality of the process leading to the [review action] evince[s] a reasonable effort to obtain the facts of the matter." *Mathews,* 87 F.3d at 637. In this case, Plaintiffs complain that no physician, aside from Drs. Pfenninger and Goddard, gave testimony regarding appropriate Ob/Gyn standards of care at the April 2, 1999 hearing before the Executive Committee. As a result, Plaintiffs contend that "the Executive Committee acted to summarily suspend the privileges of Dr. Pfenninger without any evidence of substandard care by Dr. Pfenninger." (Pls.' Combined Memo. in Opp'n at 18.) This argument rests on the assumption that only those physicians in the same field as the physician under review are qualified to determine whether emergency action is necessary. The HCQIA, however, contains no such requirement, *cf. Rogers v. Columbia/HCA,* 971 F.Supp. 229, 234 (W.D.La.1997) (declining to interpret § 11151(9) as requiring consultation with a sub-specialist in the same field as the physician being reviewed), and imposition of one would seem highly impractical. Before acting to summarily suspend Dr. Pfenninger's staff privileges, the Executive Committee reviewed approximately twenty years of Dr. Pfenninger's patient care his-

tory. The Committee also sought input from physicians and nurses with first-hand knowledge of three more recent incidents of perceived substandard care, and allowed Dr. Pfenninger an opportunity to present his side of the story. The Committee did not base its decision exclusively on Dr. Pfenninger's skill as an Ob/Gyn. Instead, the Committee found that Dr. Pfenninger had exercised poor judgment, acted with haste, and developed an ineffectual relationship with Lutheran's nursing staff. The Court finds that the record contains insufficient evidence to support the view that Exempla Defendants failed to make a reasonable effort to obtain the facts regarding the quality of Dr. Pfenninger's care before approving summary suspension of his privileges.

### (c) Adequate notice and hearing

The HCQIA contains detailed provisions regarding adequate notice and hearing procedures. The Act also contains an emergency provision, which specifically permits summary suspensions "subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." 42 U.S.C.A. § 11112(c)(2). Courts have held that the HCQIA's emergency provision " 'does not require imminent danger to exist before a summary restraint is imposed. It only requires that the danger *may* result if the restraint is not imposed.' " *Sugarbaker,* 190 F.3d at 917 (quoting *Fobbs v. Holy Cross Health Sys. Corp.,* 29 F.3d 1439, 1443 (9th Cir.1994) (emphasis added)).

Here, the Executive Committee found that Dr. Pfenninger had exercised poor judgment in three recent cases; that he had a history of similar problems, and that summary suspension was "necessary to protect patients." The Court is convinced that these findings satisfy the requirements of § 11112(c)(2). Thus, even though the Executive Committee did in fact pro-

vide notice and a hearing before acting to summarily suspend Dr. Pfenninger's privileges, no such notice and hearing were required under HCQIA's emergency provision.

#### (d) Reasonable belief that facts warranted action

Plaintiffs complain that the facts presented to the Executive Committee did not justify summary suspension of Dr. Pfenninger's privileges. To support their argument, they point to the Hearing Panel's decision that summary suspension of Dr. Pfenninger's privileges was unwarranted. Congress deemed the HCQIA's emergency provisions necessary "to allow quick action where it would be reasonable to conclude that someone's health might otherwise suffer." H.R.Rep. No. 99–903, at 11–12 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6394. In this case, after reviewing Dr. Pfenninger's patient care history, and after allowing Dr. Pfenninger an opportunity to present evidence in his favor, the Committee determined that Dr. Pfenninger had performed a postpartum procedure in an inappropriate location without proper monitoring equipment, rushed a complex cancer surgery in a non-emergency situation, and used over-aggressive delivery techniques. The Committee also found a historical pattern of similar behavior and an inability to work effectively with nursing staff. These findings support the view that committee members reasonably believed that summary suspension was necessary to protect patients. The Court is unwilling to hold that an inference of unreasonable action arises whenever an intermediate reviewing body disagrees with the conclusion of an emergency panel. *See Austin*, 979 F.2d at 735 (holding that review panel's finding that summary suspension of physician was unreasonable was insufficient "to establish the nonexistence of the defendant's 'reasonable belief' and 'reasonable effort' "). Especially so in this case, where the Hearing Panel agreed with the Executive Committee that Dr. Pfenninger had delivered substandard or marginal care in several instances, but nonetheless found summary suspension unwarranted. The Board of Directors had "difficulty making sense of the [Hearing Panel decision,]" and ultimately ruled that the Executive Committee had a "sound basis" to determine that allowing Dr. Pfenninger to continue practice would have "posed a substantial likelihood of injury to [Lutheran] patients." (Pls.' Supp. Memo. in Opp'n Ex. N.)

#### (2) Recommendation of conditional reinstatement of privileges, and approval of conditions by Board of Directors

#### (a) Reasonable belief that action was in furtherance of quality health care

Plaintiffs make much of the fact that Exempla Defendants required Dr. Pfenninger to release all claims against all parties involved in the peer review process as a condition of his reinstatement. The Court finds this evidence insufficient to rebut the statutory presumption of immunity. The release was but one of approximately ten conditions to reinstatement of Dr. Pfenninger's privileges recommended by the Executive Committee and approved by the Board of Directors. The remaining conditions required educational training and extensive monitoring of Dr. Pfenninger's patient care, and Plaintiffs have put forth no evidence indicating that Exempla Defendants did not reasonably believe that compliance with these conditions "would restrict incompetent behavior or would protect patients."

#### (b) Reasonable effort to obtain facts

After imposing the summary suspension, the Executive Committee sought input from an outside expert in Dr. Pfenninger's area of practice, Dr. Schmidt, who reviewed fourteen of Dr. Pfenninger's cases and submitted a report to the Committee. Both the Committee and the Board of Directors considered Dr. Schmidt's report

along with other evidence in the record prior to recommending and ultimately imposing the conditions to reinstatement of Dr. Pfenninger's staff privileges. Plaintiffs have produced no evidence to rebut the presumption that the Executive Committee and the Exempla Board of Directors made a reasonable effort to obtain the facts in this case.

### (c) Adequate notice and hearing

Section 11112(b) of the HCQIA, called the safe harbor provision, lists conditions that, if met, satisfy the notice and hearing requirement of § 11112(a)(3):

(b) Adequate notice and hearing

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating—

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)—

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right—

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C.A. § 11112(b). Section 11112(b) explains, however, that "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section." *Id.* Thus, the ultimate inquiry is whether the notice and hearing procedures were "fair under the circumstances." *See Islami v. Covenant Med. Ctr., Inc.,* 822 F.Supp. 1361, 1377 (N.D.Iowa 1992).

In this case, Plaintiffs have put forth insufficient evidence to suggest that the notice and hearing procedures were unfair. Dr. Pfenninger received written notice of each proposed action, which notices contained statements regarding the reasons for such actions. Dr. Pfenninger was also notified of his right to appeal at every step of the review process, and was granted three hearings on the matter, one each before the Executive Committee, the Hearing Panel and a panel of the Board of Directors. His attorney attended and participated in all three hearings, and Dr. Pfenninger was permitted to present witnesses in his behalf and to select some of the individuals appointed to the Hearing Panel.

Plaintiffs' only notable complaint with respect to the procedural fairness of the post summary-suspension review process is that neither Dr. Pfenninger nor his attorney were permitted to cross examine Dr. Schmidt, the outside expert who found that many of Dr. Pfenninger's patients had received substandard or marginal care. The Court finds that the lack of opportunity to cross examine this witness does not raise a triable issue of fact to rebut the statutory presumption of procedural fairness. Dr. Schmidt did not testify at any of the hearings. He submitted a report of Dr. Pfenninger's care, which report was provided to Dr. Pfenninger prior to the hearing before the Board of Directors. Nothing in the record suggests that the Board of Directors prohibited Dr. Pfenninger from contesting Dr. Schmidt's findings with his own expert, or from calling Dr. Schmidt as a hostile witness in order to cross examine his report. In short, the Court finds nothing in the record to indicate that the procedural requirements of § 11112(b) were not satisfied in this case, and, to the extent that Dr. Pfenninger was not provided an opportunity to cross examine Dr. Schmidt, the Court finds that the peer review procedures were "fair under the circumstances."

**(d) Reasonable belief that facts warranted action**

For reasons outlined in the above discussion, the Court finds Plaintiffs' evidence insufficient to rebut the presumption that the Executive Committee and the Board of Directors acted in the reasonable belief that the facts uncovered in the review process warranted reinstatement of Dr. Pfenninger's staff privileges only upon agreement to the specified conditions.

**e. Summary of Findings**

The CAC's determination that Exempla Defendants acted in good faith has no preclusive effect with respect to issues of qualified immunity under either the HCQIA or the CPRA. However, the Court finds that Plaintiffs' evidence, even when viewed in the light most favorable to them, would not allow a reasonable jury to conclude that Lutheran's peer review of Dr. Pfenninger's patient care failed to meet the standards set out in § 11112. Therefore, except for damages relating to alleged violations of Dr. Pfenninger's civil rights, which are expressly excluded from HCQIA's grant of immunity, Defendants Exempla, Inc., Exempla Lutheran Medical Center and Drs. Hunter and Burstein may

not be held "liable in damages under any law of the United States or of any State." 42 U.S.C.A. § 11111(a)(1). Accordingly, these Defendants are entitled to summary judgment on Plaintiffs' state law claims for defamation, trade disparagement, and tortious interference with contractual and business relations. HCQIA immunity also extends to Plaintiffs' antitrust claim against these Defendants. Having concluded that Exempla, Inc., Exempla Lutheran Medical Center and Drs. Hunter and Burstein are entitled to immunity under the HCQIA, the Court need not determine whether these Defendants are also entitled to immunity under the CPRA.

### *Conclusion*

For reasons stated,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for partial summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants Colorado Preferred Physicians Organization, Inc. and Health Care Select, Inc.'s motions for summary judgment are **GRANTED,** and that all of Plaintiffs' claims against these Defendants are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Defendants Exempla, Inc., Exempla Lutheran Medical Center, Exempla Medical Group of Colorado, and Drs. Phillip Burstein and Robert Hunter's motion for summary judgment is **GRANTED,** and that all of Plaintiffs' claims against these Defendants are **DISMISSED WITH PREJUDICE.**